## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**PATRICIA WALKER-SWINTON**                                    **PLAINTIFF**

**v.**                          **Case No. 4:18-CV-886 (KGB)**

**PHILANDER SMITH COLLEGE, AND**
**DR. RODERICK PRESIDENT SMOTHERS, SR., PRESIDENT,**
**IN HIS INDIVIDIAL AND OFFICIAL CAPACITY,**
**AND DR. ZOLLIE STEVENSON, JR., VICE-PRESIDENT,**
**ACADEMIC AFFAIRS, IN HIS INDIVIDIAL AND**
**OFFICIAL CAPACITY**                                    **DEFENDANTS**

### PLAINTIFF'S BRIEF IN SUPPORT IN OPPOSITION OF THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

This is an employment discrimination case, brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, et seq., as amended ("Title VII"); the Arkansas Civil Rights Act of 1993. The plaintiff alleges that the Defendants engaged in, and continue to engage in, a pattern and practice of employment discrimination, both intentional and systemic, on the basis of gender against the plaintiff. The Defendants' discriminatory practices include, but are not limited to harassment, and retaliation on the basis of gender, discrimination in job assignment, equal pay and compensation as alleged in this complaint. The plaintiff seeks declaratory, and equitable monetary relief from these practices; compensatory and punitive damages; equitable remedies of accounting, restitution and disgorgement.   Plaintiff filed her Charge of Discrimination with the U.S. Equal Employment

1

Opportunity Commission (EEOC) on August 21, 2018. On August 30, 2018, the EEOC issued its Dismissal and Notice of Rights letter.   On November 28, 2018, Plaintiff filed her Complaint. (*Dkt. 1*)

## II. Statement of Facts

### A. Ms. Swinton's Employment with Philander Smith College

Patricia Walker-Swinton is a 48 year - old African American female.  Patricia Walker-Swinton (Ms. Swinton) received her Bachelor's of Science degree in biology and a minor in Chemistry from the University of Arkansas at Pine Bluff, Arkansas.  Ms. Swinton received her Masters of Arts degree in Education from the University of Arkansas at Little Rock, AR. (**Ex. 1 Swinton Credentials).**  In August 2011, Ms. Swinton began her employment with Philander Smith College (PSC) under a terms of employment agreements.  Among other things, PSC was required to comply with its employment duties and policies. (**Ex. 2** PSC Handbook) Specifically, PSC agreed but failed to provide annual performance evaluations, secretarial assistance, and access to research facilities.

In August 2011 - 2012, Ms. Swinton was hired as Reading and English Coach.  In the summer of 2012, Ms. Swinton was appointed as Director of the Cheer and Dance Program, hired, and remained as Head Coach of cheer and head coach of dance which became known as the Panther Dolls until the wrongful termination of Ms. Swinton in 2018. (**Ex. 3 Swinton Depo.,  Ex. 4 Affidavit Swinton**)  In August 2012 - 2013, Ms. Swinton was hired as an Instructor of English. (**Ex. 3, Employment Contracts)** In August 2013 – 2017, Ms. Swinton was hired as an Instructor of Developmental English.  (**Ex. 3, Employment Contracts)** In the Summer of 2015, Ms. Swinton was hired as English Instructor for the START Summer Bridge Program.  (**Ex.  4 Affidavit Swinton,  Ex.  5 Affidavit of Ervin, Ex. 4 Affidavit of Swinton)**

In the Summer of 2016 and 2017, Ms. Swinton was hired as English Instructor and Academic Lead for the START Summer Bridge Program. **(Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin)** In January 2014, Ms. Swinton was appointed and hired as the Interim Chair for the Division of General Education. **(Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin)** In October 2017 - 2018, Ms. Swinton was hired as Department Chair of Literacy Skills. **(Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin)**

During the course of Ms. Swinton's employment she devoted full time to research by developing part of the 10-year-long range strategic plan, speaking at conferences, advising students, teaching, maintaining office hours, observing grading deadlines, producing administrative work and participating in committee assignments. **(Ex. 6 Ten Year Long Range Strategic Plan, Ex. 7 Swinton Publishing)** She was attending weekly chapel programs, Commencement programs, And other college activities. **(Ex. 8 Committees, Ex. 4 Affidavit of Swinton)** Further, Ms. Swinton was qualified for the position of head cheer and dance position. **(Ex. 4 Affidavit of Swinton)**

### B.  Ms. Swinton's Complaints

As early as 2012, Ms. Swinton began making complaints to Human Resources, defendants President Smothers and Stevenson, the athletic director, security, other coaches, law enforcement, and others about the discrimination, gender, breach of contracts, harassment, retaliation. **(Ex. 5 Affidavit of Ervin, Ex. 4 Affidavit of Swinton, Ex. 9-20 Emails)** Defendants were offended by Ms. Swinton's continuous complaints. Defendant demonstrated angst with Ms. Swinton's complaints for fair treatment.

3

**C.  April 9, 2018 Classroom Incident**

On April 9, 2018, while Ms. Swinton was administrating a quiz in her Composition I class, an adult male student, J. M., failed to comply with the course syllabus and student handbook requirements prohibiting student use of cellular devices during testing. (**Ex. 2 Course Syllabus, Ex. 2 Student Handbook Policy P __, Ex. 4 Affidavit of Swinton,  Ex. 21 Police Report**) After J.M.'s non-compliance to Ms. Swinton's repeated requests for J. M. to put his phone away, Ms. Swinton collected J. M.'s exam.  J. M. - the adult male - stormed out of the classroom in a heated rage.  The testing of other students continued.  T. G., the adult male's girlfriend remained in the testing setting.  Upon completion of testing, Ms. Swinton reiterated the requirements and proper conduct during testing.  The adult male was not present in the classroom during Ms. Swinton's review.  T. G. inappropriately confronted and challenged her instructor, Ms. Swinton.  (**Ex. 4 Affidavit of Swinton, Ex. 22 Statements of Students, Ex. 3 Swinton Depo. P. ___**) J. M. the adult male who previously exited the classroom was not identified as disabled. The class was a general education course - not a developmental course. (**Ex. 4 Affidavit of *Swinton*, Ex. 22 Statements of Students, Ex. 3 Swinton depo, P. ___, Ex. 23 Stevenson depo., P. ___**)  The adult male student re-entered the classroom after his girlfriend left and returned with him; he came in cursing and threatening Ms. Swinton and attempted to physically attack her.  (Ex. 24  Incident Report of T.G.) P Ms. Swinton contacted the campus security for protection.  (**Ex. 4 Affidavit of Swinton, Ex. 25 Affidavit of Office Gaines**) On April 9, 2020, Ms. Swinton filed formal complaints with the administration, defendants, security, and the local police.  (**Ex. 4 Affidavit of Swinton, Ex. 25 Affidavit of Office Gaines, Ex. 21 LRPD Police Report**)

Ms. Swinton immediately contacted Stevenson for assistance to get protection. Stevenson's assistant, Desiree Ellison, advised Ms. Swinton that Stevenson was out of town

attending a conference meanwhile directed Ms. Swinton to complete a packet of forms, that she provided Ms. Swinton.  (**Ex. 4 Affidavit of** *Swinton***, Ex. 22  Statements of Students, Ex. 50 Swinton depo. , P. ___, Ex. 26 Packet**)  Ms. Swinton contacted Stevenson by texts and the two began exchanging texts regarding Ms. Swinton's formal complaint. (**Ex. 3 Swinton depo, Ex. 4 Affidavit of Swinton**)  The defendants have  attempt to include a cafeteria incident in with Ms. Swinton's  complaint  for  harassment  against  adult  male  student  J.M,  however,  Ms.  Swinton unequivocally contends she has no knowledge or involvement of the incident.  (**Ex. 4 Affidavit of Swinton, Ex. 27 Affidavit of A. P. , Ex.  28 Affidavit of K. C.,  Ex. 29 Affidavit of J. W., Ex. 3 Swinton depo.)**

### D.  The Administrative hearing – ( Mehdizadegan, Stevenson, Doman)

On April 10, 2020, Ms. Swinton was contacted by Stevenson for an administrative hearing to be held that same day. (**Ex.  4 Affidavit of Swinton, Ex. 3 Swinton depo. P. )**   Stevenson admitted the convening was a hearing. (**Ex.  23 Stevenson depo. P. 168, 174 )**   **The Panel consisted  of  members  of  the  President's  Executive  Cabinet:   Stevenson,  VP  Academic Affairs, Dakota Doman, VP Student Affairs, and Mehdizadegan, General Counsel.** PSC violated their policy.  PSC Student Handbook says the initial Harassment Complaints are handled by the Office of Human Resources. (**Ex. 50 P. 44**)  The Office of Human Resources was not involved.

Stevenson led Ms. Swinton to believe that he was conducting an investigation related to her formal complaint.  Stevenson did not inform her that students had made a formal complaint her**.  (Ex. 23  Stevenson depo. P 175)**  Ms. Swinton that Instead, Ms. Swinton's arrival to the administrative hearing she was confronted by PSC's attorney, who conducted the hearing, while defendant Stevenson and Doman sat mute watching. (**Ex. 4 Affidavit of Swinton**)

Stevenson advised the hearing was to investigate Ms. Swinton's complaint for harassment and the students' complaint against Ms. Swinton.  **(Ex. 23 Stevenson depo. P 174)**   Mr. Mehdizadegan questioned Ms. Swinton.  (**Ex. 4 Affidavit of Swinton, Ex. 30 Affidavits of 2 students**) Ms. Swinton asserts that she was further violated by Mr. Mehdizadegan when he forcefully took her cellular phone from her without her permission and took pictures using his cellular device. (**Ex. 4 Affidavit of Swinton, Ex. 30 Affidavits of 2 students**) Ms. Swinton's direct supervisor, Dr. Sheer, was not noticed by the defendants of the administrative hearing. (**Ex. 4 Affidavit of Swinton, Ex.  3, Ex. 23 Stevenson depo. P. 86**)   Ms. Swinton was confronted by the all BBC male panel. (**Ex. 31 Admin Hearing Chart,  P. 173, Ex. 32 Admin Panel,  Ex. 4 Affidavit of Swinton, Ex.  4  Swinton Depo., Ex.  23 Stevenson depo) Ex. 30 Affidavits of 2 students**) Stevenson admitted he mislead Ms. Swinton as to the true nature of the hearing.  (**Ex. 23 Depo. Stevenson P. 175**)  Ms. Swinton was the target at the hearing, not the victim.  The Defendants failed to conduct an investigation on Ms. Swinton's Complaint for harassment against male student J. M. Although the defendants allege they J.M. had a hearing before the Student Disciplinary Committee, Ms. Swinton was not called as a witness to testify about the harassment she endured at the hands of J. M.  Instead, the defendants held a hearing with J.M. about a fight he participated in with other students.  Male student J. M.  was never punished for harassment to Ms. Swinton.

### E.   PSC's Office of Human Resource  did not conduct an investigation of Ms. Swinton's Harassment Complaint

PSC did not conduct an investigation of Ms. Swinton's Complaint of Harassment against adult male student that harassed her in the Classroom Incident on April 9, 2020 and subsequently on days that followed.  Stevenson admitted that he did not interview any students not even J. M. (**Ex. 23.  Stevenson depo. P. 156, 158,  162**) The Office of Human Resource did not **conduct any investigation.**  The Office of Human Resource was not involved.  A Panel consisted of members

of the President's Executive Cabinet:  Stevenson, VP Academic Affairs, Dakota Doman, VP Student Affairs, and Mehdizadegan, General Counsel held a hearing**.** PSC violated their policy. PSC Student Handbook says the initial Harassment Complaints are handled by the Office of Human Resources. **(Ex. 50 P. 44)**  The Office of Human Resources was not involved.

(a ) PSC failed to follow investigation policies. During the nearly 7 years of employment Swinton enjoyed an unblemished record of professionalism, with no complaints against her until four men, President Roderick President Smothers, Dr. Zollie Stevenson, Dr. Dakota Doman and Chief of Security Arthur Williams, ignored policy when she reported being threatened and harassed in her classroom.

(b ) The College failed to apply the Initial Investigation Policy on page 44, of the Philander Smith College Student Handbook, effective August 1, 2016.  The policy states: "Initial Investigation. After receiving a complaint of harassment directly from a student, faculty member, staff member, or administrator, or indirectly from a person designated to receive complaints, the Office of Human Resources shall promptly conduct an initial investigation." There was no Initial Investigation.  No one interviewed Swinton.  Instead, Stevenson admits PCS held an administrative hearing.  There was no Initial Investigation of Swinton's harassment complaint.

( c )  The College failed to apply the Formal Investigation Policy on page 45, of the Philander Smith College Student Handbook, effective August 1, 2016.  The policy states: "If the complaint cannot be informally resolved after the initial investigation, the Office of Human Resources shall continue the investigation or designate someone to promptly conduct further investigation of the complaint, which may in some circumstances be an outside neutral third party. In many instances, the Office of Human Resources will designate the individual or committee within the school or department where the complaint arises to investigate complaints. The persons charged with

investigating the complaint must discuss the complaint or the underlying behavior only with persons involved in the case who have a need to know the information, including the complainant and the accused harasser."  President Smothers, Stevenson, Doman, Williams, nor HR conducted a Formal Investigation that included an interview with Swinton's incident with Swinton.  She was by-passed by all four men, even to the extent that even her female supervisor was not allowed to take part in the investigation of the incident. A Formal Investigation was not held. Stevenson by his own admission held an administrative hearing without conducting a Formal Investigation of Swinton's harassment complaint.

( d) The College failed to apply the policy on Resolution within Thirty (30) Days on page 45 of the Philander Smith College Student Handbook, effective August 1, 2016.  The policy states: "Resolution within Thirty (30) Days. Within thirty (30) working days of receiving the complaint, the Office of Human Resources or its designee, including the appropriate school grievance committee, shall make a finding of whether harassment occurred. If the investigation cannot be concluded within that time, the Office of Human Resources shall notify the complainant and the College's General Counsel, who shall designate the appropriate person or faculty committee to promptly conclude the investigation."  President Smothers, Stevenson, Doman and Williams all failed to provide a resolution within thirty (30) days.  No interview of Swinton took place.  More than seventy-five (75) days passed before PSC terminated Swinton, still not having followed policy for an Initial investigation, or a Formal Investigation that included an interview about the classroom incident where she was threatened.

(e ) The College failed to apply the policy on Objectivity found on page 45 of the Philander Smith College Student Handbook, effective August 1, 2016.   The policy states: "Objectivity. The

complainant and the accused are entitled to an investigation conducted by an impartial investigator. Thus, if the person(s) charged with overseeing or investigating harassment complaints are implicated in the complaint, or have any personal issue that would cause a conflict of interest; the committee member or members shall recuse themselves from the proceeding. Alternatively, the Human Resources Officer shall conduct the investigation and make findings or shall designate someone impartial to do so, which may in some circumstances be an outside neutral third party. The College will proceed with the investigation and formal resolution process when deemed appropriate by the Office of Human Resources." There was no objectivity. President Smothers, Stevenson, Doman and Williams are the only College personnel involved in receiving Swinton's complaint. Fact: No women were included in the investigation. No one interviewed her about the classroom incident. All four (4) men are in the same fraternity known for *brotherhood*. President Smothers, Stevenson and Doman in particular were aware of Swinton's past complaints. Conveniently, PSC has not presented any discovery on a detailed conversation with J.M. concerning the classroom incident where he attached Swinton. An objective neutral party was not selected to investigate. When Swinton, after fearing another attack, after crossing paths on campus with J.M. her male provocateur seek protection from the Prosecuting Attorney's office PSC elected to retaliate without objectivity. Without investigation notes from PSC security. Without notes from HR.

## Pre-text for Termination

Stevenson stated he called Ms. Swinton to attend the administrative hearing with Swinton. Present at the Administrative Hearing was Doman and PSC's attorney who conducted all of the questioning.

a.  The hearing did not include a single witness from the classroom incident reported to the President Smothers and Stevenson.  **(Ex. 23 Stevenson depo. P. 156, 158, 159, 162)**

b.  The hearing was out of order according to PSC policy.  There should have been an extensive investigation to include the voices of the students that witnessed the classroom threat by J. M. (Ex.

**c.**  The all-male hearing created an inquisition like atmosphere where Swinton's personal property in the form of a mobile phone was snatched from her. **(Ex. 3 Swinton depo. P. 149)**

d.  No one in the administrative hearing sought out information about the threat to her life which occurred before any other matter PSC has used as a reason for her termination.

**e.**  The administrative hearing was seeking information about a male altercation that happened elsewhere on campus unbeknownst to Swinton. **(Ex. 23 Stevenson depo. P. 175-176)**

f.  PSC has never provided a single piece of discovery proving that Swinton sent someone to confront J. M.  It is all assumed.

g.  The male culture is so dominant at PSC, the adult male combatants were not disciplined, or expelled from school according to PSC policy on fighting as noted on page 83 of the PSC Student Handbook.  **Ex. 2.**

h.  J. M. was a personal associate of the males and socialized with President Smothers **(Ex. 91 PSC Male BBC)**  Photo taken from Rev Yow's public Facebook page  was taken April 6, 2018.  Ms. Swinton's attack occurred April 9, 2018.

i.  At the time of the incident, J.M. was an adult (not a minor).  PSC claimed J.M. was a minor.

j.  There was no disciplinary action taken against Ms. Swinton in April, nor May, nor until the time frame in when Ms. Swinton complained about her safety to the Little Rock Police. **(Ex. 21 Little Rock Police Report)**

k.  After years of complaining about not being paid correctly (which Stevenson admits), not being treated fairly as a Coach (as school documents have exposed that she was a "Coach'); and being made to serve a Chair (but not paid as a chair) in a male dominated culture, Swinton finally complained about her safety and was terminated under pre-text of findings from a hearing that took place over 70 days earlier without due process according to PSC policy.

l.   PSC produced an email written by a '***student***', named _____ to suggest a parent came forth to complain about Swinton.  PSC cannot produce the name of the parent, who lodged a complaint.  The student happens to be the girlfriend -T. G. - of the man that threatened Swinton.

**m.**  Swinton's long list of accomplishments and clean record was dismissed by a group of males that did not think to protect her. **(Ex. 1,** Swinton Credentials, **Ex. 7  Swinton's Published works,  Ex 77)**

n.   The males are known as the brotherhood:  Roderick President Smothers, Zollie Stevenson, Dakota Doman, David Lewis, Chris Smith and Arthur Williams.

**The Philander Smith College Student Handbook, effective August 1, 2016 indicates on page 41, under Policy Coverage:**

"All faculty, administrators, staff, students, and individuals affiliated with Philander Smith College by contract (including non-employees, such as vendors and independent contractors) are bound by this policy. This policy protects men and women equally from harassment, including same-sex harassment, and protects students from harassment by other students." **(Ex. 2, PSC Handbook)**

**F.   The Decision**

Stevenson recommended termination of Ms. Swinton to President Smothers. **(Ex. 38 Letter of Termination)**

**G.   Ms. Swinton's Claims for Compensation**

Ms. Swinton made repeated complaints for lack of pay and lack of timely pay to her supervisors.

**(Ex. 34 Affidavit Coach Weaver, Ex. 4 Affidavit of Swinton)**  Ms.  Swinton's position as Head Coach of the Panther Dolls is a budgeted item on the Athletic Director's budget. **(Ex. 34 Affidavit Coach Weaver)**

(a) Ms. Swinton did not register the Dolls as a non-profit with the Arkansas Secretary of State, instead the Assistant coaches registered the team. **(Ex. 34 Affidavit Coach Weaver, Ex. 4 Affidavit of Swinton, Ex. 35 Affidavit of Jason Roberson, Ex. 35 Affidavit of Justin Roberson**

(b) Coach Weaver gave Ms. Swinton permission to do everything necessary to build the Panther Dolls into a successful team. **(Ex. 34 Affidavit of Couch Weaver)** Dr. Collea McKinney created the Athletics Department Website pages. She also was the bursar at PSC, and witnessed males being placed in the higher paid positions with few credentials while females with higher credentials were placed in the lower paid positions. The females would do more work and not receive the compensation**.** McKinney was assistant coach of the women's volleyball team and was not paid, while her husband was assistant coach of the men's basketball team and he was paid. Further, McKinney was the assistant athletic director and was not aid for that position either. Dr. McKinney simultaneously held triple duties Sports Information Director and assistant athletic director and assistant women's volleyball coach. **(Ex. 69 Affidavit of McKinney)**

(c ) Athletic Director Coach Weaver gave Ms. Swinton permission to open the bank account for for funding to support the Panther Dolls. **(Ex. 4 Affidavit Swinton, Ex. 3 Depo Swinton, Ex. 34 Affidavit Coach Weaver, Ex. 99 Ex. 99 Affidavit of Jason Roberson, Ex. 35 Affidavit of Justin Roberson)**

(d) Ms. Swinton did not collect dues from the Dolls' participants. **(Ex. 34 Affidavit Coach Weaver, Ex. 4 Affidavit of Swinton, Affidavit of Jason Roberson, Ex. 35 Affidavit of Justin Roberson).** Ms. Swinton was given permission by Coach Weaver to do whatever she needs to do. **(Ex. 34 Affidavit Coach Weaver, Ex. 4 Affidavit of Swinton, Affidavit of Jason Roberson, Ex. 35 Affidavit of Justin Roberson)** Coach Weaver submitted timely requests for payment to Swinton for the contractual amount promised to her but President Smothers did not sign approval. (**Ex. 34 Affidavit Coach Weaver, Ex. 4 Affidavit of Swinton)**

PSC Alumni welcomed the remarkable job Ms. Swinton did to build the Panther Dolls. Her direction with the team increased school participation. **(Ex. 53 and 54 PSC Alumni)**

### III. <u>ARGUMENT</u>

Defendants PSC, and Smothers and Stevenson, at all times acted in their official capacity on all claims.   The defendants never conducted an investigation of Plaintiff's harassment complaint that she had violated and threatened in her classroom by the adult male student, J. M. Defendants acted in concert with assistance of advice and wrongfully terminated Ms. Swinton. Defendants violated their own policy of grievance procedures**. (Ex. 37, PSC Faculty Handbook, Grievance Policy, P.   44)** More than 2 ½ months later, PSC sent Ms. Swinton a Notice of Termination for Cause.  **(Ex. 38 Letter of Termination)**  As noted in the defendants opening brief, PSC was focused on incidents surrounding a cafeteria fight that Ms. Swinton had involvement.  **(Ex. 4, Swinton Affidavit, Ex. 27, Affidavit of A. P., Ex. 28. Affidavit of K. C., Ex. 29. Affidavit of J. W. , Ex. 3 Swinton depo.)**  Ms. Swinton was nowhere near the cafeteria incident.   It is important to note that there is not one statement or affidavit included in the defendants brief that Ms. Swinton was involved with the cafeteria fight.

Ms. Swinton was subjected to gender discrimination as head coach with respect to her coaching compensation for the PSC cheer team and dance team collectively known as the Panther Dolls, and PSC breached its contracts to pay her.  Ms. Swinton was subjected to breach of contract when PSC failed to pay Ms. Swinton contracted amounts for her duties as head cheer coach and head dance coach and reimbursements of expenses she fronted and incurred during fulfillment of her coaching duties. Moreover, Ms. Swinton was subjected to gender discrimination as department chair with respect to her compensation compared to other similarly situated male department chair heads. Ms. Swinton was subjected to breach of contract when PSC failed to pay her the contracted amounts for her position of department chair. Further, plaintiff can establish that she was subjected to gender discrimination as division chair head with respect to her compensation compared to other

similarly situated male division chair heads.  Ms. Swinton was subjected to breach of contract when PSC failed to pay her the contracted amounts for her position of division chair.  Ms. Swinton was subjected to discrimination when she was demoted from Division Chair, as compared to male division chair head and that she did not receive a stipend for her work as Division Chair during that time.  Ms. Swinton was subjected to retaliation for her continuous complaints of the breach of contacts, for her continuous complaints of gender discriminatory treatment she endured as head female coach, for her continuous complaints of breach of contract as head department and division chair.

The male dominated Brotherhood Boys Club (BBC) culture of PSC is discriminatory against females.  Defendants President Smothers and Stevenson are both males. They are both members of the same male Alpha club.  The males at PSC who violate policy are neither terminated nor severely reprimanded – including the president.  Defendant President Smothers has admitted the frequent use of offensive, curse language in the presence of students, disabled students, parents, and faculty. **(Ex. 33 Affidavit of President Smothers)** Others heard President Smothers use curse and offensive language in public school functions**.) (Ex. 39 Affidavit of T.W., Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin, Ex. 40 Affidavit of Beard, Ex. 41 Affidavit of Duvall)**

Likewise, other male employees – David Lewes and Chris Smith have used offensive, and curse language in front of the president - defendant President Smothers - who turns a brotherhood blind eye. **(Ex. 39 Affidavits of T.W. , Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin, Ex. 40 Affidavit of Beard)**  Even the adult male student J. M., who verbally assaulted, attempted to physically attack, and threatened Ms. Swinton and undisputedly violated Ms. Swinton's course syllabus policy **(Ex. 2)** and the PSC Student Handbook Policy, was shortly thereafter rewarded.

14

President Smothers blessed J. M. with employment in President Smothers' office and with further employment as a student mentor and tutor in the 2018 START Summer Bridge Program.  The same START Summer Bridge Program which Ms. Swinton previously helmed and complained of breach of contact.  **(Ex. 54 Affidavit of Students, Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin, Ex. 42, Affidavit of P. L.)**  In the Fall of 2018, despite J. M.'s violation of PSC Student Handbook Policy, PSC overlooked J. M.'s conduct by allowing J. M. to become a member of the BBC.  J.M. pledged a fraternity.  **(Ex. 43, PSC Student Handbook)**

Ms. Swinton never called or referred to any student as "retarded" or a "retard" during classroom instruction, or otherwise**.  (Ex. 4 Affidavit of Swinton, Ex. Swinton depo., Ex. 22 Statements of Student Witnesses, Ex. 48 Affidavit of Student Witnesses, Ex. 24 Incident Report of T.G.)**  Student witnesses present in the classroom did make attest to same. **Ex. 48 Affidavits of Student Witnesses)** Defendants never contacted any students who were present in that classroom for statements**.  (Ex. 48 Affidavit of Student Witnesses, Ex. 23 Stevenson depo. P. 156, 158, 159, 162)** J. M. never filed a complaint against Ms. Swinton.  After Ms. Swinton began repeatedly complaining of J.M. harassing her and then filing a formal complaint with the Little Rock Police Department, the BBC retaliated and refused to respond to Ms. Swinton's complaint, refused to return Ms. Swinton's calls, locked Ms. Swinton out of her work computer, denied her access to student files, grades records, and even her own documents, making it difficult to get her work done.   The BBC had enough and used the April 9, 2020, classroom incident as the pretext for terminating Ms. Swinton.

Prior to the classroom incident Ms. Swinton complained of being treated differently than younger male coaches.  Ms. Swinton was the Head Coach of the female cheer and dance teams. The Cheer and dance teams are listed under the Athletic Coaches Budget. **(Ex. 34 Affidavit Coach**

**Weaver, Ex. 35 Assistant Coach Jayson Roberson, Ex. 36 Assistant Coach Justin Roberson, Ex. 4 Affidavit of Swinton, Ex. 42 Affidavits Former Panther Dolls, Ex. 49 Former Panther Dolls Email exchanges with President Smothers)** Ms. Swinton was not given a budget as the other younger male coaches. Ms. Swinton was denied a key to the gymnasium, whereas the male coaches were provided keys. Ms. Swinton was required to generate and or use her own resources to buy some team performance uniforms, pay for out of town hotel lodging, hosting school competitions, feeding the team members**. (Ex. 34 Affidavit Coach Weaver, Ex. 35 Assistant Coach Jayson Roberson, Ex. 36 Assistant Coach Justin Roberson, Ex. 4 Affidavit of Swinton, Ex. 42 Affidavits Former Panther Dolls)** Male coaches were budgeted scholarships for their athletes. Whereas, Ms. Swinton's teams were promised and later denied scholarships. **(Ex. 34 Affidavit Coach Weaver, Ex. 35 Assistant Coach Jayson Roberson, Ex. 36 Assistant Coach Justin Roberson, Ex. 4 Affidavit of Swinton, Ex. 42 Affidavits Former Panther Dolls)** President Smothers posited the Panther Dolls cheer team and dance team were not recognized by the National Association of Intercollegiate Athletes. (N.A.I.A.) **(Ex. 33 Depo. President Smothers depo. P. 60)** A fact which Athletic director, Nathan Weaver refutes. **(Ex. 34 Affidavit Coach Weaver)**

Also, another incident where President Smothers treated Ms. Swinton differently than others occurred at the end of the 2016-2017 school. President Smothers was planning to get rid of Ms. Swinton. President Smothers has always signed contracts for the upcoming year in May for the next school year. President Smothers did not sign Ms. Swinton's 2017-2018 contact until October 17, 2017. Ms. Swinton was required to work the entire summer following the 2016-2017 school year without contract. Then Ms. Swinton worked in the S.T.A.R.T Program in the Summer of 2017, and was not paid for her position for Academic Lead. **(Ex. 3 Contract 2017-2018)** This was another violation of PSC Policy**. (Ex. 37 Faculty Handbook p. 42)** Since 2014, Ms. Swinton

16

had been complaining to President Smothers about not receiving pay for Division Chair, budget for cheer and dance, pay for cheer and dance.  Cochran texted Swinton advising President Smothers had a problem with her.  **(Ex. 27 (Cochran - Swinton texts)** Swinton was still complaining about not receiving division chair pay and the unfairness because Bruce James was Division Chair in the Business Department.  James had not earned a PhD.    President Smothers excuse for not paying Ms. Swinton pay for Division Cahir was because Ms. Swinton had not earned a PhD.  **(Ex. 4 Affidavit of Swinton)**  However, President Smothers refused to sign Ms. Swinton's contract until after the next year began.  They contract was not executed until October 17, 2017**. (Ex. 3, 2017- 2018 Employment Contracts)**

## IV. <u>Statement of Law</u>

### A.    <u>Summary Judgment Standard</u>

 Pursuant to Rule 56 of the Federal Rules of Civil (FRCP), a movant is entitled to an order granting summary judgment when there is no genuine issue as to any material fact.

> Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party.   The court must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party prevail as a matter of law.'

<u>Twin City Bank, et al. v. Verex Assurance, Inc</u>., 733 F.Supp. 67 (E.D.Ark. 1990), citing, <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  "On summary judgment the plaintiff need only present sufficient evidence to raise genuine doubt as to the legitimacy of the defendant's motives."  <u>Peterson v. Scott County</u>, 406 F.3d 515, 522 (8th Cir. 2005).

> "Summary judgment should be 'cautiously invoked' so that no person will be improperly

deprived of his Seventh Amendment right to a jury trial where there is no genuine issue as to any material fact." Robertson v. White, 635 F.Supp. 851, 870 (W.D. Ark. 1986). The Eighth Circuit has also held that "a judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Medical Institute of Minnesota v. Nalts, 817 F.2d 1310 (8th Cir. 1987).

The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and any doubt should be resolved in favor of the party resisting the motion. Ozark v. Milling Co., Inc. v. Allied Mills, Inc., 480 F.2d 1014 (8th Cir. 1973); see also, Tolan v. Cotton, 572 U.S.    , 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The courts have held that since summary judgment is such an extreme remedy, a motion for summary judgment should be granted "only if no genuine issue exists as to any material fact." Haas v. Weiner, 765 F.2d 123 (8th Cir. 1985). "In deciding whether to grant a motion for summary judgment, the district court must view the evidence in favor of the party opposing the motion and give him the benefit of all reasonable inferences." Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990); Kegal v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986); Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1244 (8th Cir. 1991); Canada v. Union Electric Company, 135 F.3d 1211, 1212 (8th Cir. 1997). Affidavits are not necessary to oppose a motion for summary judgment. See Adams d/b/a D. L. Adams Motors v. Hudspeth Motors, Inc., 587 S.W.2d 227 72 (Ark.App. 1979).

> Fed.R.Civ.P. 56(c) provides that summary judgment shall be entered if the 'pleadings, depositions answers to interrogatories, and admissions on file together with the affidavits, *if any*, show that there is not a genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'

Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990) (emphasis added).

"Summary judgment should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion.  All the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the non-moving party."  Holly v. Sanyo Mfg. Inc., 771 F.2d 1161, 1164 (8th Cir. 1985).

The Courts have also held that "[s]ummary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.2d 1097, 1099 (8th Cir. 2000), *citing Walker-Swinton v. St. Louis University*, 109 F.2d 1261, 1264 (8th Cir. 1997) (Arnold, R., C.J., Beam & Alsop, JJ.); *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) (Bowman, Heaney & Longstaff, JJ.); *Lynn v. Deaconess Med. Center West Campus*, 160 F.3d 484, 486 (8th Cir. 1998) (Arnold, R., Beam & Arnold, M., JJ.); *Helfer v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir. 1997) (Loken, Arnold, M. & Gunn, JJ.); *Bialas v. Greyhound Lines, Inc.* 59 F.3d 759, 762 (8th Cir. 1995)(Beam, Gipson & Murphy, JJ.0; *Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995) (Hanson, Gibson, F. & Will, JJ.); *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1045 (8th Cir. 1994), (McMillian, Bright & Loken, JJ); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994)(Arnold, R., C. J. Wollman & Beam, JJ.); *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir. 1991) (McMillian, Fagg & Strom, JJ.); *Hillebrand v. M-Tran Industries, Inc.*, 827 F.2d 363, 364 (8th Cir. 1987)(Lay, C. J. Heaney & Larson, JJ.). "Summary judgment should seldom be granted in employment discrimination cases because intent is often the central issues and claims are often based on inference."  Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005).

The Eighth Circuit cautioned against using summary judgment in discrimination cases. "Notably, we have repeatedly emphasized that 'summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is

often difficult or impossible to obtain.'" <u>Torgerson v. City of Rochester</u>, 605 F.3d 584, 593 (8th Cir. 2010), *quoting*, <u>Wallace v. DTG Operations, Inc</u>., 442 F.3d 1112, 11117 (8th Cir. 2006); *see also*, <u>Peterson v. Scott County</u>, 406 F.3d 515, 520 (8th Cir. 2005)[1].  We have also cautioned that summary judgment should not be granted in 'close' cases. '[T]he need to resolve factual issues in close cases is the very reason we have juries.' <u>Torgerson</u>, 605 F.3d at 594, citing, <u>First National of Omaha v. Three Dimension Systems Products, Inc.</u>, 289 F.3d 542, 545 (8th Cir. 2002); *see also*, <u>Keho v. Anheuser-Busch, Inc</u>., 995 F.2d 117, 120 (8th Cir. 1993).

> [t]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc*., 494 U.S. 545, 554-555 (1990); *Liberty v. Lobby, Inc*., *supra*., at 254; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6 (1962).  'Credibility determinations, the weighing of the evidence, and all the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' *Liberty Lobby*, *supra*, at 255.  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Wright & Miller 299*.  That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'

<u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

> Summary judgment is warranted when there remain no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  We review de novo the summary judgment record in light most favorable to Bell to determine whether or not a reasonable person could make inferences supporting plaintiff's claims.  *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111 (8th Cir. 1995).  But neither the district court's function nor ours is to weigh evidence in the summary judgment record to determine the truth of any factual issue; we merely determine whether there is evidence creating a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 249-51 (1986).  Because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing summary judgment.

DeAudra Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999) (emphasis added), *citing* Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1205 (8th Cir. 1997).

At the summary judgment stage, "[t]he controlling issue ordinarily is whether or not there exists a genuine issue of fact regarding any discriminatory motive." Strate v. Midwest Bankcenter, Inc.,398 F.3d 1011, 1017-1018 (8th Cir. 2005). The Eighth Circuit further stated that, "[w]e have long recognized that a genuine issue of fact regarding unlawful employment discrimination may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action." Strate, 398 F.3d at 1017, *citing* O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995).

[A]    plaintiff bringing an employment discrimination claim may succeed in resisting a motion for summary judgment where the evidence, direct or circumstantial, establishes a genuine issue of fact regarding an unlawful motivation for the adverse employment action (i.e., a motivation based upon a protected characteristics), even though the plaintiff may not be able to create genuine doubt to the truthfulness of a different, yet lawful, motivation.

Strate, *supra.*

[B]    42 U.S.C. § 1983

Ms. Swinton brings this cause of action pursuant to 42 U.S.C.S. § 1983, contending that she was deprived of her federally protected rights, by persons acting under color of law. The language of 42 U.S.C.S. § 1983 reads as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is well established that 42 U.S.C.S. § 1983 is an enforcement for violations of a citizen's individual rights as guaranteed by the Fourteenth Amendment of the United States Constitution. A bill introduced in the House of Representatives on March 28m 1871 as H.R. 320 (which is codified as 42 U.S.C.S. § 1983), known as the Civil Rights Act of 1871, was introduced as "a bill 'to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.'" Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). "The history of the Act (Civil Rights Act of 1871) is replete with statements indicating that Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982).

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982). The Court went on to noted that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'state action' requirement of the Fourteenth Amendment are identical." 457 U.S. at 929. The key language in § 1983 for the case at bar is "custom or usage."

> [T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to government 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.

Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Ms. Swinton contends that she was discriminated against based on her gender, when she was denied payment for her services as her male coaching counterparts.

The plaintiff also contends that she was retaliated against for having complained about discriminatory treatment. The defendants have deprived the plaintiff of her federally protected rights of not being subjected to discrimination based on gender.

A.    <u>Title VII of the Civil Rights Act</u>

The Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e−2, makes it unlawful to discriminate against a person in the employment context.  The law states:

It shall be an unlawful employment practice for an employer−

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national status.

"The language to Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 676 (1973), *citing*, <u>Griggs v. Duke Power Co</u>., 401 U.S. 424, 429, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); <u>Castro v. Beecher</u>, 459 F.2d 725 (1st Cir. 1972); <u>Chance v. Board of Examiners</u>, 458 F.2d 1167 (2nd Cir. 1972); <u>Quarles v. Phillip Morris, Inc</u>., 279 F.Supp. 505 (E.D. Va. 1968).

**Prima Facie Case**

The plaintiff in a Title VII case has the initial burden of establishing a *prima facie* case of gender discrimination.  A *prima facie* case of gender discrimination is demonstrated if the plaintiff shows the following:

(i)      that she is a member of a protected group;

(ii)      she was meeting the legitimate expectation of the employers;

(iii)      that, she suffered an adverse employment action; and

(iv)      the adverse employment action occurred under circumstances permitting an "inference of discrimination."   Lewis v. Heartland Inns of Am., L.L.C., 591 F.3d 1033, 1038 (8th Cir. 2010) (citing Bearden v. Int'l. Paper Co, 529 F. 3d 828, 831 (8th Cir. 2008)

Under the McDonnell Douglas Corp. v. Green, 36 L.Ed.2d at 677, "The threshold of proof necessary to make a *prima facie* case is minimal . . . ." Johnson v. Arkansas State Police, 10 F.3d 547 (8th Cir. 1993), *citing* Saint Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The *McDonnell Douglas−Burdine* burden-shifting framework was created because only rarely will a plaintiff have direct evidence of discrimination.  Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disable or a member of certain race or religion.  To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the above elements, unlawful discrimination was the most likely reason for the adverse personnel action.  The elements of that prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.

Geraci v. Moody−Tottrup, International, Inc., 82 F.3d 578, 581 (3rd Cir. 1996), *citing* McDonnell
Douglas, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824 n. 13; Torres v. Casio, Inc., 42 F.3d 825, 830 (3rd
Cir. 1994).

 "The threshold of proof necessary to make a prima facie case is minimal . . ." Johnson v. Arkansas
State Police, 10 F.3d 547 (8th Cir. 1993), *citing* Saint Mary's Honor Center v. Hicks, 509 U. S.
_____, 125 L.Ed.2d 407, 113 S.Ct. ___ (1993).

**Prong 1**

It is undisputed that Ms. Swinton is a member of protected class based on her female gender.
Plaintiff has met the first element of her *prima facie* case.

**Prong 2**

It is undisputed that Ms. Swinton was meeting the legitimate expectation of her employers.  Ms.
Swinton engaged in Employment Contractual agreements with PSC beginning August 2011 and
continuing through June 2018.  Ms. Swinton demonstrated a commitment to PSC and the students.
Ms. Swinton showed up for work daily and often not receiving the contractual agreed amounts for
her work.  For seven years, Ms. Swinton upheld her part of the contractual agreement she engaged
with PSC. During the course of Ms. Swinton's nearly seven year employment, she devoted full
time to research by developing part of PSC's 10-year-long range strategic plan, teaching,
Publishing, contributor to a Companion Text for Teachers, Students, and Researchers Published
Contribution, Professional activities), speaking at conferences, advising students, maintaining
office hours, observing grading deadlines, producing administrative work and participating in
committee assignments, attending weekly chapel programs, Commencement programs, coaching
the cheer and dance teams, and other college activities. **(Ex. 6 10-Year Long Range Strategic Plan,
Ex. 7 Ex. 8  Standing committees).**  Ms. Swinton's supervisor, Dr. Ervin sings accolades of Ms.

25

Swinton's contributions to PSC.  (**Ex. 5 Affidavit of Ervin**)   Stevenson was unaware of any complaints made against Ms. Swinton during his tenure at PSC.  Further Stevenson did not have any knowledge or proof that Ms. Swinton ever received any unfavorable annual evaluations.  (**Ex. 23 Depo of Stevenson depo**)

Ms. Swinton did not violate PSC Policy.  Instead PSC violated its own Policies:  PSC Policy for Reappointment of Term Faculty (**Ex. 37 faculty Handbook P 48**)

… they are entitled to the due notice of non-appointment, given in writing by the President, in accordance with the following "Standards for Notice".  Reappointment of Term Faculty.  At least twelve months before the expiration of an appointment after two or more years in the institution. (**Ex. 37 Faculty Handbook P. 48**)   Because President Smothers was withholding signing the employment contract from Swinton. Ms. Swinton's Employment Contract for 2017-2018 was not signed until October 17, 2017.  Ms. Swinton had already begun the semester and was teaching five classes and serving as Division Chair- without receiving any pay.

There are material facts in dispute:

(a )  Whether Ms. Swinton used a disability slur when addressing her "remedial" class in referring to a "disabled" student?

No.  Ms. Swinton did not used a disability slur.  Ms.  Swinton explained that her use of words within the context expressed from the urban dictionary was neither offensive or harassment and that she used the term "retard" in the same context as President Smothers.  Ms. Swinton explained the term describes a city and in unrelated to a race of people. ( **Ex. 3 Swinton depo., P. 114, Ex. 4 Affidavit of Swinton**)

(b )  Whether Ms. Swinton was teaching a "remedial" English Class?

No.  <u>Ms. Swinton was not teaching a remedial English class.</u>   In October 2017 - 2018, Ms.

Swinton was hired as Department Chair of Literacy Skills.  **(Ex. 3 Contract)** On April 9, 2018,

Ms. Swinton was teaching a general education English course. **(Ex. 2 Course Syllabus)**

Stevenson admitted the course **was not a remedial or developmental course**. **(Ex. 23 Depo.**

**Stevenson depo., P. 138, Ex 4 Swinton depo., P. 96-97, Ex. 48 Affidavit of Students, Ex. 26**

**Packet)** PSC Faculty Handbook 6.6, eligibility for services s determined individually based on

determination of need.  To receive disability related accommodations and services, students

**must first register** with the Integrated campus Center Disabilities Services (ICCDS) Office and

**provide current and appropriate medical and/or psycho-educational documentation** which

identifies the specific nature and extent of a qualifying disability, including the functional

limitations currently imposed by the disability. **(Ex. 37 PSC Faculty Handbook 6.6, P. 60)**

Neither the ICCDS Office nor J. M. ever advised Ms. Swinton that J.M. had a disability.  Ms.

Swinton first heard of this assertion during deposition of Stevenson. Stevenson revealed the

location of J.W. 's files.   Ms. Swinton subpoenaed information from ICCDS and the Registrar's

Office that he had a disability.  The defendants filed a motion to quash the subpoenes.  Students

eligible Students with Disabilities are identified through the Department of Disability Support

Services. **(Ex. 23  Stevenson depo. P. 237-238)** Documentation of a student with a disability

that would be provided by to the disabled students' instructors.  **(Ex. 23 Stevenson depo. P. 237-**

**238**)  Ms. Swinton never received any emails noticing her that there were any students in her

general education English course with disabilities. **(Ex. 4 Affidavit of Swinton)** Defendants

admit J. M. was a transfer student from Grambling State University.   PSC policy does not allow

transfer student with a disability would not be allowed to enroll in a general education course.

( c ) Whether Ms. Swinton referred to a "disabled" student?

No. <u>Ms. Swinton did not refer to a "disabled" student</u>.  Ms. Swinton did not refer to any particular student when admonishing her class about the Syllabus class rules and the Student Handbook Policy.  The defendants are alleging the adult male student who verbally assaulted and threatened Ms. Swinton's - J. M.- is a disabled student.  J. M. is not a disabled student.  During the time Ms. Swinton addressed her class, J.M. had already bolted out of the classroom after refusing to put his cell phone away during testing.  Also, the Letter of Termination did not suggest Ms. Swinton called or referred to any student specifically. Further, student witnesses in the classroom affirm the English course was not remedial or developmental.  **(Ex. 48 Affidavits of Students)**

Plaintiff has met the second element of her *prima facie* case.

## Prong 3

It is undisputed that Ms. Swinton suffered an adverse employment action.  The defendants wrongfully terminated Ms. Swinton. (Ex. 99 Letter of Termination)  Plaintiff has met the third element of her *prima facie* case.

## Prong 4

The adverse employment action occurred under circumstances permitting an "inference of discrimination."  <u>Lewis v. Heartland Inns of Am., L.L.C.,</u> 591 F.3d 1033, 1038 (8th Cir. 2010) (citing Bearden v. Int'l. Paper Co, 529 F. 3d 828, 831 (8th Cir. 2008)

Plaintiff can show more favorable treatment of similarly situated employees who are not in the protected class, or biased comments by a decisionmaker. Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir.2011) (citing *Lewis*, 591 F.3d at 1039-40).  Plaintiff has met the fourth element of her *prima facie* case.

## Decision Making To Terminate

Stevenson made the recommendation to President Smothers to terminate Ms. Swinton.
**(Ex. 33 President Smothers depo., P. 24, Ex. 23 Ex. 38 Letter of Termination).**  On June 27,
2018, Stevenson wrote Ms. Swinton a Letter of Termination.  "You failed to disclose material
information in the course of the College's investigation…"  "…the President has empowered me
dismiss you for cause immediately."  **(Ex. 38 Letter of Termination)**  President Smothers said
he did not review any documents supporting Stevenson's recommendation to terminate Ms.
Swinton. **(Ex. 33 President Smothers depo. P 24)** It is important to note that President
Smothers deposition was taken February 25, 2010, the candidacy of President Smothers'
testimony is questionable especially in light of his testimony that Stevenson no longer worked at
PSC.  **(Ex. 33 President Smothers depo P. 25-26)**  Stevenson's deposition was taken May 29,
2020, where he testified he has been adjunct faculty at PSC since January 2020, teaching 3 online
classes and special assistant to President Smothers. **Ex. 23 Stevenson depo., P. 43 – 49)**

It is disputed whether PSC conducted an independent investigation of Ms. Swinton's formal
complaint. **(Ex. 38 Letter of Termination)**  The administrative hearing PSC held was a ruse to
investigate Ms. Swinton and not Ms. Swinton's formal complaint that she filed against J. M. **(Ex.
23 Stevenson depo. P. 168, 174)**  On April 10, 2020, Stevenson led Ms. Swinton to believe that
he was conducting an investigation related to her formal complaint by requesting that she
immediately report to a hearing.  **(Ex. 4 Affidavit of Swinton, Ex. 3 Swinton depo., P. 3**, Ex. 23
**Stevenson depo. P.  174)**  Instead, Ms. Swinton's was confronted b*y PSC's attorney, who
conducted* the hearing, while defendant Stevenson and Doman sat mute watching Mr.
Mehdizadegan question Ms. Swinton.  **(Ex. 4 Affidavit of Swinton, Ex. 30 Affidavits of 2
students***)* Ms. Swinton asserts that she was further violated by Mr. Mehdizadegan when he
forcefully took her cellular phone from her without her permission and took pictures using his

cellular device. (**Ex. 3 Affidavit of Swinton, Ex 3 Swinton depo., P. 148, Ex. 30 Affidavits of 2 students**) Ms. Swinton's direct supervisor was not noticed by the defendants of the administrative hearing.  (**Ex. 4 Affidavit of *Swinton)***  Ms. Swinton was confronted by the all BBC male panel. (**Ex. 31, Ex. 3 Affidavit of *Swinton,* Ex.  4 Swinton Depo., Ex. 23 Depo. Ex. 4 Affidavit of Swinton, Ex . 30 Affidavits of 2 students**) Stevenson admitted he mislead Ms. Swinton as to the true nature **of** the hearing.  Dakota Doman wrote an incident statement as witness to the April 9, 2020 classroom incident of which Ms. Swinton complained.  Then Doman sat in on the BBC panel to investigate and then sit in judgment of Ms. Swinton. (**Ex. 4 Affidavit of Swinton**) At the same time Doman was the Director of Student Affairs-the same office that would be sitting in judgment of J. M. 's hearing determining if any disciplinary action would be imposed against J. M.

PSC never conducted an investigation of Plaintiff's complaint that she was violated and threatened in her classroom by the adult male student.  Defendants acted in concert with assistance of advice and wrongfully terminated Ms. Swinton. Defendants violated their own policy of grievance procedures. (**Ex. 37, PSC Handbook, Grievance Policy, P. 57**)

The matter of who actually makes the decision to follow through on the adverse employment action is an important factor in determining "but for" causation. Courts will likely regard any decisions to terminate made by a supervisor solely on recommendation from the alleged discriminating person as a "rubber stamp." However, if the supervisor bases his decision on his own independent investigation, "but for" causation will not likely be found. PSC did not follow the established process for independent review prior to any adverse employment action.

On April 9, 2020, Ms. Swinton contacted Ms. Swinton spoke with Carla Carter, VP Faculty Senate, who helped Ms. Swinton write the formal complaint via text on how to file the formal

complaint for harassment.  **(Ex. 72 Swinton-Carter texts)**  Dr. Carter said she decided she did

not want to be involved in the grievance because her mother, Etta Carter "is on the Board and

she's very close with President Smothers".  PSC 's reason for termination for cause is a genuine

material issue for jury determination.

Therefore, the defendant's termination for cause claim must fail.

The plaintiff contends that she was subjected to disparate treatment on account of her gender

when she did not receive pay for service as Head Coach for Cheer and Dance teams, while, while

her male counterparts were.  Her male counterparts reported to the same supervisor, the Athletic

Director, Thurlon Weaver.  Continuously, Ms. Swinton complained to the athletic director, other

coaches, President Smothers, Stevenson, and Human Resources, Chris Newton about the

disparate treatment she was subjected to as Head Coach of the Cheer and Dance teams in the

athletic department**.  (Ex. 4 Affidavit of Swinton, Ex.  34 Affidavit of Weaver, Ex. 5 Affidavit**

**of Ervin, Ex. 51 Deposition of Newton, Ex. 55 Complaints- unfair treatment emails, Ex. 56**

**Greenwood texts, Ex.  57 Cochran texts)**

"Disparate treatment arises when an employer simply treats some people less favorably than others

because of their race, color, religion, sex, or national origin. . . ." <u>Bonilla v. Oakland</u> <u>Scavenger</u>

<u>Co.</u>, 31 FEP Cases 50, 53 (9th Cir. 1983), *quoting*, <u>International Brotherhood of</u>

<u>Teamsters v. United States</u>, 431 U.S. 324, 335-36 n. 15, 14 FEP Cases 1514 (1977).

> In a race discrimination case, a plaintiff may survive a defendant's motion for
> summary judgment in one of two ways.  The plaintiff may present admissible evidence
> directly indicating unlawful discrimination, that is, evidence showing a specific link
> between the alleged discriminatory animus and the challenged decision, sufficient to
> support a finding by a reasonable fact finder that an illegitimate criterion actually
> motivated the adverse employment action. *Russell v. City of Kan. City, Mo*., 414 F.3d
> 863, 866 (8th Cir. 2005).  Alternatively, if the plaintiff lacks such evidence of
> discrimination, she may survive the defendant's motion for summary judgment by
> creating an inference of unlawful discrimination under the burden-shifting framework

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Fields v. Shelter Mutual Insurance Co., 520 F.3d 859, 863-864 (8th Cir. 2008).

"Instances of disparate treatment can support a claim of pretext, but Lynn has the burden of proving that he and the disparately treated female nurses were 'similarly situated in all relevant respects.'" Lynn v. Deaconess Medical Center-West Campus, 160 F.3d 484, 487 (8th Cir. 1998). "To be probative of pretext, the alleged misconduct of other employees must be of 'comparable seriousness.'" Elam v. Regions Financial Corporation, 601 F.3d 873, 881 (8th Cir. 2010).

PSC's athletic program has been and still remains a part of the N.A. I. A. conference since 2011. The school has not changed conferences. Despite the fact that each group listed on the Athletics Budget received individual budgets that were submitted by each coach, then approved by the athletic director, the final approval came from President Smothers.  Although Weaver approved the budgets presented by Ms. Swinton, the Head Coach of the dance and cheer teams, President Smothers would not approve a budget for Head Coach Swinton.  President Smothers approved budgets for all male coaches. The male coaches received their pay from their employment contracts.  Ms. Swinton did not receive all of her pay for coaching the Panther Dolls. **(Ex. 3 Affidavit of Swinton, Ex. 34 Affidavit of Weaver)**

The defendants concede that three (3) male employees - President Smothers, Chris Smith and David Lewis -violated the Employee Handbook Policy on Harassment without retribution.

It is customary that females are treated differently at PSC. **(Ex. 60, Deposition of CJ Duvall P. 77:18-20, 66, P. 86:15-18)**. In addition, PSC has demonstrated turning a blind eye to male violation of PSC's policies without reprimand. **(Ex. 60, P. 75:22-25, P. 76:1-6).**

Ms. Swinton, as an example of disparate treatment on this campus that oppresses women, Mr. Bruce James is cited as an interim chair with a masters degree from the Univ of AR of LR. **(Ex.**

32

**87, Bio Bruce James)** Ms. Swinton is listed as Chair from the Depart of Literary Skills with a master's degree from the UA of LR.  Bruce James was paid more than Patricia Walker-Swinton. Frank James in his testimony admitted he was paid as a department; however, PSC refused to pay Ms. Swinton as both Division Chair and Department Chair. Exerts PSC 2018-2021 Catalogue **(Ex. 89).** Swinton Depo (Ex 4, P.40, 7:2-3). **(Ex. 4 Affidavit of Swinton) (Ex 58, Frank James Depo., P.6:20-21, P. 17: 24-25, P. 18:1-8)**

David Lewis, in Summer 2016, in the START Program, President Smothers cursed and threatened

students during Freshman Orientation **(Ex. 42. Affidavit of Panther Dolls, Ex. 48   Affidavit of Student Witnesses, Ex. 39. Affidavit of Student T.W., Ex. 23  Stevenson's Depo.)** In the Fall 2016-David Lewis Cursed Ms. Swinton in an open staff meeting.  President Smothers was present in the meeting.  Meeting Under the Auspicious to Discuss Panther Dolls Budget. Defendant President Smothers set a meeting to address the none-issuance of a Panther Dolls budget. Those in attendance were members of his BBC and Ms. Swinton was the lone female. Brandon Greenwood was athletic director. He was extremely rude when Ms. Swinton complained to him about not receiving a budget as the other coaches, pay, and a key to the gymnasium where the girls practiced. Ms. Swinton's cheer and dance teams had to wait until the basketball coaches were there to open the gym. Ms. Swinton's cheer and dance teams had to wait until the male coaches were done with practices late in the night for her girls to practice. Ms. Swinton was not paid during the time of her services as head coach. **(Ex. 4 Swinton's Affidavit, Ex. 3 Swinton's Depo., Ex. 59 Greenwood Depo., Ex. 56 Greenwood's text message, Ex. 42 Former Panther Dolls)**   Ms. Swinton complained about Lack of Pay  **(Ex. 3 Swinton Depo.,  P. 408:14-15,  Ex. 4 Swinton's Affidavit).**

 In the Summer 2017, START Program Ms. Swinton served as the Academic Lead in the Summer START program. As the Academic Lead. As Academic Lead, Ms. Swinton generated

the list of the class rosters for the students in the summer START program.  Adult male student J.M. did not attend the summer START program—as he was not identified as a developmental student. **(Ex. 4 Affidavit of Swinton)**

Adult male student J. M. was, in fact, a transfer student from Grambling State University, and Ms. Swinton subpoenaed the records of JM that would refute PSC's alleged disability status. PSC has refused to provide same (DKT); moreover, student J.M. did not enroll in a developmental English class at PSC. Student J.M. was enrolled in Ms. Swinton's Composition I during his first semester at PSC, which was spring 2018. **(Ex. 4 Affidavit of Swinton)** It should be noted that developmental classes do not transfer from institution to institution. **(Ex. 79 None Credit for Transfer of Developmental Courses)**

President Smothers curses and threatens students during Freshman Orientation.  In October 2017,

President Smothers hosted an all - male birthday bash for an employee. **(Ex. 39 Affidavit of Student T. W.)**

In Spring 2018 – Honors Convocation, President Smothers tells students, "**I will personally put your asses** on a bus back home!" and says "**I had lots of sex** when I was your age."  President Smothers is comfortable enough to use offensive language in a public arena which reflects why he allowed it to happen to Ms. Swinton in a private arena. **(Ex. 39 Affidavit of Student T.W., Ex. 42 Former PSC Panther Dolls)**

**Pay Equity**

In the summer of 2015, Ms. Swinton was accosted by Chris Smith, special assistant to the president and the Program Coordinator for Special Programs, *Chris Smith's Bio* (Ex. 72), in the form of verbal abuse where Chris Smith cursed Ms. Swinton in the presence of Defendant President Smothers because Ms. Swinton reminded him of the responsibly of the tutors that he

was responsible for. It is to be noted that Chris Smith was hand-picked special assistant by Defendant President Smothers. Chris Smith was angry because Ms. Swinton reminded him of their duties. Another Executive of the college, Darnell Williams was also present. Upon conclusion of the program, Ms. Swinton did not receive agreed upon pay. (**Ex. 3 Swinton depo. P. 406:2-3**) However, the males—Chris Smith and Frank James—that denied Ms. Swinton of her pay received pay. Ms. Swinton was retaliated against for challenging their authority; therefore, Ms. Swinton was not paid.

**(Ex. 3 Swinton Deposition, Ex. 58 Affidavit of Frank James Deposition P. 37: 15-25, P. 38:1-18, P. 41:16-43, P. 49:5-9)**

In the fall of 2017, in a meeting with Stevenson, member of the BBC, Ms. Swinton was informed that she was required to continue to work as Division Chair but without Division Chair pay. Stevenson stated that President Smothers directed Ms. Swinton to work without Division Chair compensation. Present at this meeting was Chris Newton, HR Director. (**Ex. 51 Newton's Deposition**) Stevenson's demand of Ms. Swinton to work without pay created a hostile work environment.

Chris Smith, Director of the START program, is a male. He had limited professional career experience for the position with one year removed from graduate school, yet he was the supervisor for Ms. Swinton. Chris Smith was in control of setting the budget for the START program. One year out of graduate school, he had limited professional experience. It is important to note that the school had a history of not posting their professional positions. (**Ex. 41 ffidavit of Duvall, Ex. 68 Smith Bio.)**

Unsafe Work Environment

Under being summoned by Zollie Stevenson to discuss Ms. Swinton's concerns for her safety after being threatened by adult, male student, J. M. and member of the BBC, Ms. Swinton was confronted by three males - Dakota Doman—another member of the BBC—and Abdtin M. Abdtin M. moderated the hearing. **Ex. 3 Swinton Depo.,  P. 127:10, P. 127:20-21, Ex. 4 Affidavit of Swinton,  Ex. 23 Stevenson Depo. P. 168:10-12,  Ex. 30 Affidavit of Student Witnesses.**

Then being subjected to further harassment, threatened, verbally attacked and assaulted and robbed of her cellular telephone during the hearing made Ms. Swinton feel very unsafe. **(Ex. 5. Affidavit of Swinton Ex. 3  Swinton Deposition P. 118:24-25,  Ex. 22 Student Witnesses. Ex. 21 LRPD Incident Report & Supplement.**

Six plus years of enduring stress, retaliation, abuse, and fear from dealing with all-male administrators resulted in Ms. Swinton's emotional distress.  At the end of the hearing, Ms. Swinton asserts PSC's counsel threatened Ms. Swinton by telling her not to speak on what happened in the hearing or he would have her terminated.

Hostile Work Environment

In fall 2016, Ms. Swinton was attacked by another one of  President Smothers' hand-picked Chief of Staff—David Lewis. Present for this particular moment were Darnell Williams and President Smothers. This was the second time that a hand-picked assistant to the president attacked Ms. Swinton in the presence of President Smothers. This underscores the hostile behavior of men that have come to be known as the "Boys Club" at PSC. This type of workplace hostility produces a sense of fear among many on the campus. **(Ex. 40 Affidavit of Beard)**

**Defendants violated the Harassment Policy**

BBC members Chris Smith and David Lewis violated PSC's harassment policy when he cursed at Ms. Swinton during a meeting in the presence of Defendant President Smothers. PSC's Harassment Policy states (**Ex. 50 PSC Harassment Policy**)

If it was unreasonable for Ms. Swinton to believe that she would remain employed after allegedly using a curse word then it would have likewise been unreasonable for Chris Smith, President Smothers, and David Lewis to remain unemployed, but because they were members of the BBC, termination was not even an option.

Also, President Smothers used offensive curse words in front of minors, the same type of urban students, yet he did not get terminated. A large urban population of students inclusive of those with disabilities and various social economic backgrounds. Defendant President Smothers, Chris Smith, and David Lewis—BBC comparators—engaged in similarly offensive conduct as Ms. Swinton but received less severe—correction—no disciplinary action. The head BBC decision maker—Defendant President Smothers—was biased in his decision making.

## Similarly Situated

The defendant makes the argument that the BBC members - male coach - comparators are not similarly situated.  Ms. Swinton posits they all are similarly situated since President Smothers makes the call who gets hired and who gets terminated.  Swinton is similarly situated with male employees of PSC but received less favorable treatment than the males.  It is undisputed that President Smothers cursed at students at commencement and at freshman orientation. President Smothers was not disciplined, censured or terminated.   His conduct violated PSC Harassment Policy.  [Harassment, other than sexual harassment, is verbal, physical, written, or other conduct that denigrates or shows hostility or aversion to an individual on the basis of gender, race, color, religion, age, national origin, ethnicity, disability, veterans status, sexual orientation, marital status,

or any basis prohibited by law when from the objective standpoint of a reasonable person such conduct substantially interferes with an individual's work or school performance, creating an intimidating, hostile or offensive working or learning environment even if the person engaging in the conduct does not intend to interfere, intimidate, or be hostile or offensive. Harassment based on any of the characteristics listed above is strictly prohibited by this policy].

Chris Smith, a male Assistant and personal friend to President Smothers cursed and threatened Swinton in a meeting. At the time of his arrival to the College, Smith was similarly situated to Swinton, yet records will show that Smith enjoyed continued opportunity to run Programs of the College and complete graduate education despite the fact that he violated PSC Harassment Policy. [Harassment, other than sexual harassment, is verbal, physical, written, or other conduct that denigrates or shows hostility or aversion to an individual on the basis of gender, race, color, religion, age, national origin, ethnicity, disability, veterans status, sexual orientation, marital status, or any basis prohibited by law when from the objective standpoint of a reasonable person such conduct substantially interferes with an individual's work or school performance, creating an intimidating, hostile or offensive working or learning environment even if the person engaging in the conduct does not intend to interfere, intimidate, or be hostile or offensive. Harassment based on any of the characteristics listed above is strictly prohibited by this policy].

David Lewis a male colleague of Swinton's, and a Chief of Staff on the President Smother's cabinet, cursed and threatened Swinton in a meeting in front of President Smothers. The President did not reprimand, or terminate Lewis. His conduct violated PSC Harassment Policy. [Harassment, other than sexual harassment, is verbal, physical, written, or other conduct that denigrates or shows hostility or aversion to an individual on the basis of gender, race, color, religion, age, national origin, ethnicity, disability, veterans status, sexual orientation, marital

status, or any basis prohibited by law when from the objective standpoint of a reasonable person such conduct substantially interferes with an individual's work or school performance, creating an intimidating, hostile or offensive working or learning environment even if the person engaging in the conduct does not intend to interfere, intimidate, or be hostile or offensive. Harassment based on any of the characteristics listed above is strictly prohibited by this policy].

~~When the employer offers unfounded reasons for the adverse employment action, the trier of fact may infer "an improper motive from evidence of the falseness of an employment proffered justification for an adverse action." Paul Hudson v. Larry Norris, et al., 227 F.3d 1047, 1051 (8th Cir. 2000), *citing*, Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2108 (2000); Campbell v. Arkansas Department of Correction, 155 F.3d 950, 958 (8th Cir. 1998).~~

## BBC Male Conspirators

**The defendant contends that the plaintiff's comparators are not similarly situated**. "The 'similarly situated co-worker inquiry is a search for a substantially similarly employee, not for a clone.'" Ridout v. JBS USA, LLC, 715 F.3d 1079, 1085 (8th Cir. 2013), *quoting*, Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010).

> While no employee is a precise clone of another, *see Chaney*, 612 F.3d at 916, the probative value of comparator evidence will be greatest when the circumstances faced by the putative comparator are most similar to the plaintiff's. Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause.' *See Lynn*, 160 F.3d at 489.

Rideout v. JBS USA, LLC, 715 F.3d 1079, 1085 (8th Cir. 2013).

> We have described the elements of a prima facie case in the specific context of a § 1981 disparate treatment claim based on allegedly discriminatory pay differentials:
>
> > To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her

employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.

Fields v. Shelter Mut. Ins., Co., 520 F.3d 859, 864 (8th Cir. 2008)[2]; *see also* Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010).

Melvin Walker-Swinton v. URS Corporation, 803 F.3d 964, 968-969 (8th Cir. 2015).

As in the case at bar, the appellate court noted that this is not a failure-to-hire case. This is a case involving disparate treatment in terms and conditions of employment.

## Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that adverse employment action occurred; and (3) a causal connection between the two. Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir. 1994), *citing*, Jackson v. Missouri Pac. R.R., 803 F.2d 401, 406-07 (8th Cir. 1986) and Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). The employer must then articulate a legitimate, nondiscriminatory reason for the adverse action, then the employee must be given an opportunity to show that the proffered reason was pretextual, and that their protected activity was the true reason. *See* Walker-Swinton v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998). This court has recognized the established rule that `an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper. Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990). We emphasize that the alleged manifestations of defendants' retaliation (such as less favorable treatment) need not themselves amount to constitutional violations. The violation lies in the **intent** to impede access to the courts.

Madewell v. Roberts, 909 F.2d 1203, 1206-1207 (8th Cir. 1990), *citing* Sanders v. St. Louis

County, 724 F.2d 665, 666 (8th Cir. 1983).

> To establish a prima facie case of retaliation, a plaintiff must show, among other things, that she suffered an adverse employment action at the hands of her employer. *See Montando v. Farmland Industry, Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. *See Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999). Termination, reduction in pay or benefits, and changes in employment that significantly affect an employees future career prospects meet this standard, *see Kerns v. Capital Graphics, Inc*., 178 F.3d 1011, 1016 (8th Cir. 1999), but minor changes in working conditions that merely inconvenience an employee or alter an employees work responsibilities do not, *see Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997).

Spears v. Missouri Department of Corrections and Human Resources, 210 F.3d 850, 853 (8th Cir.

April 28, 2000).

The plaintiff was subjected to a pattern of retaliatory conduct after having complained about

discriminatory treatment, and harassment by an adult male student and making a police report.

After filing her formal complaint for Harassment the following acts of retaliation occurred:

- On April12, 2018, removing Ms. Swinton from accessing her emails, student files, student grades while treating her male attacker as royalty (**Ex. 3 Affidavit of Swinton, Ex. 4 Swinton depo., p. 113**, **Ex 62 April 12, 2018, Swinton - Stevenson email exchanges, Ex. 63 April 26, 2018, Swinton-Stevenson icloud email exchanges);**

- On April 26, 2018, Ms. Swinton was the Department Chair of Literacy Skills when Stevenson contacted her to via icloud because he was aware that he had directed that her access to her email be locked. (**Ex. 63 April 26, 2018, Swinton-Stevenson icloud email exchanges)**

- terminating the plaintiff's employment on June 27, 2018, allegedly for calling an adult male disabled student that harassed her a disability slur in the classroom where she was teaching. **(Ex. 12 Letter Termination)**

The plaintiff was terminated just ( 2 ) days after the Prosecuting attorney's office mailed a Warning Letter to PSC after she made a police report regarding being harassed by adult male student J. M. at PSC and she did not receive any help from the BBC - all male administrators. **(Ex. 88 Letter from Prosecuting Attorney)** An inference of a causal connection between the filing of Ms. Swinton's police report and termination can be drawn from the timing of the two events, *Riceland*, 151 F.3d at 819-20; *Walker-Swinton v. St. Louis University*, 109 F.3d 1261, 1266 (8th Cir. 1997), but in general more than a temporal connection is required to present a genuine factual issue on retaliation, *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*).@ Peterson v. Scott County, et al., 406 F.3d 515, 524 (8th Cir. 2005).   The Eighth Circuit also said, A[b]ut this much is clear: temporal proximity rises in significance the closer the adverse activity occurs to the protected activity.  The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes. E.E.O.C. v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003). The defendant a pattern and practice of terminating female employees who complain about discrimination.  The plaintiff collected the following information from public records: *Discharge formed the basis of the EEOC Charge.

**VI. Ms. Swinton has established a prima facie case of gender discrimination**

The Defendants execute a herd mentality willing to follow the dictates of a president even in the face of not following guidelines and policies. The policies only apply to the females. The following employees filed EEOC Charges of Discrimination based on other than race:

| Name | Date Filed | Reason | Termination Date | Reason |
|------|-----------|--------|------------------|--------|

| Sharonda Rodgers | 11/15/13 | Sex | Work study  Fall 2013 | Un-specified |
|---|---|---|---|---|

The President at the time of the EEOC complaint was Dr. Johnny Moore.  The president at the time of the Federal Lawsuit was Dr. Roderick President Smothers, Sr.

| Name | Date Filed | Reason | Termination Date | Reason |
|---|---|---|---|---|
| Gemessia Hudson | 3/25/2016 | Retaliation | 2/22/2016 | Tardiness, Lack of Communication  Violation of Policy. |

The President at the time of the EEOC complaint was Dr. Roderick President Smothers, Sr.  The male that terminated Hudson was the same male she complained had no experience compared to her seven years of fundraising experience.  The male was hired by Dr. Roderick President Smothers, Sr.

| Name | Date Filed | Reason | Termination Date | Reason |
|---|---|---|---|---|
| Gemessia Hudson | 3/25/2016 | Sex | 2/22/2016 | Tardiness, Lack of Communication  Violation of Policy. |

The President at the time of the EEOC complaint was Dr. Roderick President Smothers, Sr. The male that terminated Hudson was the same male she complained had no experience compared to her seven years of fundraising experience.  The male was hired by Dr. Roderick President Smothers, Sr.

| Name | Date Filed | Reason | Termination Date | Reason |
|---|---|---|---|---|
| Gemessia Hudson | 3/25/2016 | Discrimination for association with a person with a disability under ADA. | 2/22/2016 | Tardiness, Lack of Communication  Violation of Policy. |

The President at the time of the EEOC complaint was Dr. Roderick President Smothers, Sr. The male that terminated Hudson was the same male she complained had no experience compared to her seven years of fundraising experience.  The male was hired by Dr. Roderick President Smothers, Sr.

| Name | Date Filed | Reason | Termination Date | Reason |
|---|---|---|---|---|
| Sharonda Rodgers | 11/15/13 | Sex | Work study Fall 2013 | Un-specified |
| Gemesia Hudson | 3/25/2016 | Retaliation | 2/22/2016 | Tardiness, Lack of Communication Violation of Policy. |
| Gemessia Hudson | 3/25/2016 | Sex | 2/22/2016 | Tardiness, Lack of Communication Violation of Policy. |
| Alda Moore | 6/11/13 | Age/Gender | 6/11/2013 | |
| Gemessia Hudson | 3/25/2016 | Retaliation | 2/22/2016 | Tardiness, Lack of Communication Violation of Policy. |

Jones v. Forrest City Grocery Inc., 564 F.Supp. 2d 863 (ED Ark. 2008). The court should be mindful that the allegations of the plaintiff must be accepted as true and if the allegations are material, the motion for summary judgment on any claim must fail.  The language contained in Jones is appropriate when analyzing whether the plaintiff has stated or alleged facts sufficient to create a prima facie case of a hostile environment.  That court stated:

"to establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that he/she is a member of a protected group (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group (4) that the harassment affected a term, condition , or privilege of employment; and (5) that the

employer knew or should have known of the harassment and failed to take prompt and effective remedial action." Anda v. Wickes Furniture Co., Inc., 517 F. 3d 526, 531-32

While the Jones court did opine that if the comments are sporadic or casual, they are unlikely to establish a hostile work environment claim, it went on to say that even infrequent conduct can be severe enough to be actionable.

Supporters of PSC have asked the Board of Trustees to help end the discrimination against women, retaliation, and misleading back stories at the college.  (**Ex. 41 Letter from Duvall to the President of the Board**) Ms. Swinton, was the victim of the offensive cursing language by male BBC member David Lewis.  The incident occurred during a staff meeting, in the presence of President Smothers.  President Smothers disregarded the offensive comments made by the fellow BBC member.  (**Ex. 3 Swinton depo., P. 149, Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin**) Ms. Swinton sat in embarrassment for President Smothers lack of protection.  Further, while attending another staff meeting, Chris Smith, President Smothers assistant, directed curse language to Ms. Swinton.  (**Ex. 99 Affidavit of Swinton**) Defendant President Smothers did not do anything.  On April 10, 2020, while Ms. Swinton was in the administrative hearing  she asserts she was further harassed by the male attorney moderator of the hearing when he snatched her cellular telephone out of her hand – without her permission - and began taking pictures of information from her phone.  (**Ex. 3  Swinton depo., P. 118, Ex. 4 Affidavit of Swinton**)  The days that followed deplorable for Ms. Swinton.

Ms. Swinton was the subject of unwelcome harassment. Beginning on April 9, 2020, adult male student, J. M. removed himself from Ms. Swinton's classroom after she requested that he put his cellular telephone away during testing. He returned with his girlfriend, T.G. to confront Ms. Swinton.  J.M. was in a raging, cursing, and threatening posture to physically harm her.  Ms.

Swinton called security.  **(Ex. 4 Affidavit of Swinton, Ex. 25 Affidavit of Officer Gaines, Ex. 48 Affidavits of Student Witnesses)** After leaving the room, J. M. returned another time where students then had to restrain J.M. from physical attacking Ms. Swinton.  Students pushed J.M. out of the classroom.  Other students rushed to cover and protect Ms. Swinton. Ms. Swinton called security a second time.  Officer Gaines arrived and witnessed J.M. cursing and raging fit. Officer Gaines directed J. M. and T. G. to go to the security station at the front of the campus. **(Ex. 25 Affidavit of Officer Gaines)**  Officer Gaines asked Ms. Swinton to give him names of student witnesses and to get witness statements from the students in the classroom when the incident happened.  **(Ex. 4 Affidavit of Swinton, Ex. 22 Statements of Student Witnesses Ex. 25 Affidavit of Gaines, Ex. 62 List of Student Witnesses)** Dakota Doman happens to pass by and speaks with the students.  Doman writes a statement of what J. M. and T.G. tells him.  **(Ex. 61 Statement of Doman)**  In Doman's statement he advises J.M. that his behavior was inappropriate and that J. M. will have to go before the Student Conduct Committee. Doman does not posit that Ms. Swinton has violated any policy.  **(Ex. 61 Statement of Doman)**

 On April 10, 2018, after the administrative hearing Ms. Swinton's work environment became even more hostile.  The adult male student, J. M. began walking past her classroom window making glaring and intimidating stares.  Also, the adult male would walk past Ms. Swinton's office door and give threatening stares to intimidate her.  Ms. Swinton reported the harassment to Stevenson.  The defendants did not take any steps to cease the harassment.  The defendants knew of the harassment and failed to take prompt and effective remedial action.  Hales v. Casey's Mktg. Co., 886 F.3d 730, 735 (8th Cir. 2018)

As further harassment, after Ms. Swinton was attacked by an adult male student, and the administrative hearing where Ms. Swinton asserts she was attacked when the moderator snatched

her cellular telephone from her hand while elbowing her.  The further harassment affected Ms. Swinton's condition and privilege of employment.  In the days that followed, Stevenson directed Brian Clay, head of technology to lock Ms. Swinton out of her computer.  Ms. Swinton could not access her grades, files, student records, assignments, or reports.  Ms. Swinton could no longer email President Smothers or Stevenson or any other faculty.  Stevenson cut-off Ms. Swinton's communication with her colleagues and students. **(Ex. 4 Affidavit of Swinton, Ex. 62, texts, Ex. 63 texts)** Ms. Swinton had to use her personal cell phone to send messages to her students regarding classwork.  Ms. Swinton had to text Stevenson for updates regarding her complain for harassment against J. M.  Stevenson would respond that there was nothing to tell her.  Stevenson knew of the harassment because he contributed to the harassment not providing security for Ms. Swinton after she had been harassed by an adult male student, and the harassment continued. Further, Stevenson contributed to the harassment by locking Ms. Swinton out of her computer.

The defendants conduct was sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of the victim's employment." Crist v. Focus Homes, Inc. 122 F.3d 1107, 1111 (8th Cir. 1997).

On April 9, 2020, after Ms. Swinton was attacked in her classroom by the adult male student, J. M. and reported the incident to Stevenson to cause an investigation to be commenced to investigate her complaint of harassment.  **(Ex. 4 Affidavit of Swinton)** From that point on, she was treated differently and ultimately fired.

The defendants terminated Ms. Swinton but failed to terminate the male employees who violated the same policy which they complain Ms. Swinton violated.  The defendants have demonstrated a pattern of terminating female employees who complain of discrimination.  PSC then terminates giving the reason of policy violation.

47

The defendants have a progressive disciplinary plan they could have implement any disciplinary or corrective actions for the male employees who were guilty of committing the same or similar offensive conduct which defendants complain Ms. Swinton allegedly committed and was allegedly the basis of termination. The administrators took no actions against the male employees who made offensive charged statements. David Lewis, director of START yelled, screamed and cursed at Ms. Swinton in front of other employees, at a staff meeting. After the meeting Lewis, President Smothers started treating Ms. Swinton differently all because Plaintiff requested President Smothers "do something" with Lewis for attacking her the staff meeting. Afterwards, the work environment became hostile toward Ms. Swinton.

**Breach of Contract**

Ms. Swinton asserts the defendants breached contracts she had with them. A breach of contract claim has two elements: (1) existence of a valid contract; and (2) breach of the contract.

The second element of a breach of contract claim is the actual breach of the subject contract. Ms. Swinton made complaints for breach of contract to Dr. Hazel Ervin, Chris Newton, Human Resources, Stevenson. **(Ex. 4 Affidavit of Swinton, Ex. 5 Affidavit of Ervin, Ex. 51 Newton depo. P. 17, 18, Ex. 3 Swinton depo. P.  252-253, 270, 272-273, 395, Ex. 9-20 emails, Ex. 52-55 Complaint emails)** The contract amounts for her employment contract was not paid. The defendant did not submit any proof of payments to Ms. Swinton. The defendants merely presented a chart which did not reflect paid. The contract amounts that S.T.A.R.T program had agreed to pay Ms. Swinton were not paid – even fter Ms. Swinton had completed working the agreed upon five weeks. Ex. **(Ex. 70 Swinton, Wallace, President Smothers, Ervin, James email about non-**

**payment in 2015 thread,  Ex. 71**. **Denied pay for START 2015)**  Specifically,  PSC breached

the employment contracts as follows:

<u>**2014**</u>    Instructor of Developmental English (Ms. Swinton taught 15 hours)

       **<u>Interim Chair General Education*</u>**

*Ms. Swinton **<u>was not paid $5,000</u>** for the interim chair position **(Ex. 4 Affidavit Swinton, Ex.**

**5 Affidavit Ervin)**

<u>**2015**</u>    Instructor of Developmental English (Ms. Swinton taught 15 hours)

       Writing Coordinator for Academic Success Center*

       *Ms. Swinton **<u>was not paid $5,000</u>** for the writing coordinator position  **(Ex. 4 Affidavit**

**Swinton, Ex.  5 Affidavit Ervin)**

<u>**2016**</u>    Instructor of Developmental English – (Ms. Swinton taught 15 hours)

       Chair General Education*

       *Ms. Swinton **<u>was not paid $5,000</u>** for the chair position **(Ex. 4 Affidavit Swinton, Ex.**

**5 Affidavit Ervin)**

<u>**2017**</u>    Department Chair Literacy Skills*  (Ms. Swinton taught 9 hours)

*Ms. Swinton **<u>was not paid $5,000</u>** for the chair position **(Ex. 4 Affidavit Swinton, Ex.  5**

**Affidavit Ervin)**

 **C. <u>PSC breached contractual agreements with Ms. Swinton for positions she held with</u>**
     **<u>the START Program:</u>**

<u>**2015   START**</u>        Agreement was to pay Ms. Swinton $2,000 per class

Ms. Swinton taught 4 classes ($8,000 owed)

Ms. Swinton **<u>was not paid $8,000</u> (Ex. 4 Affidavit Swinton, Ex  5 Affidavit Ervin)**

<u>**2017   START**</u>        Agreement was to pay Ms. Swinton $2,000 per class

Agreement was to pay Ms. Swinton $5,000 for Academic Lead

Ms. Swinton taught 4 classes ($8,000 owed)

Ms. Swinton **was not paid $8,000** for the 4 classes she taught in 2017 START **(Ex. 4 Affidavit Swinton, Ex  5 Affidavit Ervin)**

Ms. Swinton  **was not paid $5,000** for the Academic Lead position she held in 2017 START

2016 Head Coach Stipend – Agreement was to pay Ms. Swinton $4,500

Ms. Swinton **was not paid $4,500** stipend.

**Total amount owed to Ms. Swinton is $45, 500.**

The Defendants also breached the employment contract with Ms. Swinton by failing to conduct an Annual Performance Evaluation, failing to provide secretarial Assistance, failing to provide access to Research Facilities, failing to provide the Faculty Handbook Policy Process for Review.

**Damages:**

The Defendants breached contractual agreements with Ms. Swinton totaling **$41, 000.**

Ms. Swinton suffered loss in income from the wrongful termination.  Ms. Swinton was in a PhD. Program in education at the University of Arkansas at Little Rock, Arkansas.  The sudden disruption in her life due to the wrongful termination induced stressors.  Ms. Swinton had to seek employment.  Ms. Swinton was employed by Pulaski County Special School District as an English teacher for the fall 2018 school year.  The position is temporary.  She received a provisional temporary teaching license. Ms. Swinton is required to take additional classes to work toward a permanent teaching license and she is required to stay at the same school for 3 years in order to receive a permanent teaching certification.  Ms. Swinton experienced a reduction in pay of nearly $8,000.  Plus, there are no additional opportunities for her to earn additional income in the public school system.  The contracted amount with Pulaski County Special School District for the 2018-

2019 school year was $36,663.70. **(Ex. 64 2018 P.C.S.S.D. Contract)** Ms. Swinton incurred

damages as a result of the wrongful termination.  Ms. Swinton has established a prima facie case

of breach of contract.

Mental Health **(Ex. 65)**

Sabrina Dickerson, MA, LPC, CRC

Counseling Sessions: Start date 4/16/2018 through 4/16/21

$100 per session x 2 visits per month $200

Heart Hospital Bill - **$14, 587.75  (Ex. 66)**

UALR Bill - **$3, 829.57** (Ex. 99 Bill) **(Ex. 67)**

## V. CONCLUSION:

In sum, the plaintiff alleges in her complaint that all of the acts which she complained of

began and were generated by the male dominated practices of the defendants. In conclusion, when

this court considers the Defendant's motion for summary judgment, this court must "view the

evidence in a light most favorable to the nonmoving party and give that party the benefit of all

inferences that might reasonably be drawn".   Buboltz v. Residential Advantages, Inc., 523 F. 3d

864, 868 (8th Cir. 2008.  In all respects, the motion for summary judgment should be denied.

Respectfully submitted,

Teresa Bloodman #2005055
Attorney for Plaintiff
P.O. Box 13641Maumelle, AR  72113
(870) 550-1940
teresabloodman@yahoo.com

<u>EXHIBIT LIST</u>

**Exhibit 1.** *Swinton Credentials—Bachelor's Degree, Master's Degree, CV, Awards, & Certificates*

**Exhibit 2.** *Course Syllabus & PSC Handbook Policy on Cell Phone Use*

**Exhibit 3.** *Swinton Deposition*

**Exhibit 3A.** *Ms. Swinton's Contracts*

**Exhibit 4.** *Swinton's Affidavit*

**Exhibit 5.** *Ervin Affidavit*

**Exhibit 6.** *10-Year Long Range Strategic Plan*

**Exhibit 7.** *Published Contribution*

**Exhibit 8.** *Standing Committees for 2017-2018*

**Exhibit 9. – Exhibit 20.** *Emails & Text Messages of Various Complaints*

**Exhibit 21.** *LRPD Incident Report & Supplement*

**Exhibit 22.** *Student Witness Statements from Classroom*

**Exhibit 23.** *Stevenson's Second Deposition*

**Exhibit 24.** *TG Incident Report*

**Exhibit 25.** *Affidavit of Gaines*

**Exhibit 26.** *Swinton Complaint Packet to Academic Affairs*

**Exhibit 27.** *Affidavit of AP*

**Exhibit 28.** *Affidavit of KC*

**Exhibit 29.** *Affidavit of JW*

**Exhibit 30.** *Student Witnesses Outside Door During Swinton's Hearing*

**Exhibit 31.** *Admin Hearing Chart*

**Exhibit 32.** *– Admin Hearing Panel*

**Exhibit 33.** *Smothers Deposition*

**Exhibit 34.** *Coach Weaver's Affidavit*

**Exhibit 35.** *Affidavit of Assistant Coach Jason Roberson*

**Exhibit 36.** *Affidavit of Assistant Coach Justin Roberson*

**Exhibit 37.** *PSC Faculty Handbook (**print 1ˢᵗ page**)*

**Exhibit 38.** *Termination Letter*

**Exhibit 39.** *Affidavit of Student TW*

**Exhibit 40** *Beard's Affidavit*

**Exhibit 41.** *Duvall Affidavit*

**Exhibit 42.** *Former PSC Panther Doll Affidavits*

**Exhibit 43.** Participating in Fraternity Intake

**Exhibit 44.** *PSC Cell Phone Policy*

**Exhibit 45** *False Accusations Forbidden*

**Exhibit 46**. *PSC Retaliation Policy*

**Ex 47**. *Investigation and Resolution of Complaints*

**Exhibit 48.** *Affidavits of Student Classroom Witnesses*

**Exhibit 49.** *Former PSC Panther Doll Email Exchange with Smothers*

**Exhibit 50.** *PSC Harassment Policy*

**Exhibit 51.** *Newton's Deposition*

**Exhibit 52.** *Affidavit PSC Alumni- SH*

**Exhibit 53.** *Affidavit of PSC Alumni- AA*

***Exhibit 52 – Exhibit 55.*** *Complaints -unfair treatment*

**Exhibit 56.** *Greenwood's Text Message Exchange with Ms. Swinton*

**Exhibit 57.** Text Message Exchange with Cochran

**Exhibit 58.** *Frank James's Deposition*

**Exhibit 59.** *Greenwood's Deposition*

**Exhibit 60.** *Duvall Deposition*

**Exhibit 61.** *Doman's Statement*

**Exhibit 62.** Email to Stevenson About Being Locked Out of Computer

 **Exhibit 63.** Email Complaint Against

**Exhibit 64.** *2018-2019 PCSSD Contract*

**Exhibit 65.** *Mental Health Report*

**Exhibit 66.** *AR Heart Hospital Results and Bill*

**Exhibit 67.** *UALR Withdrawal and Bill*

**Exhibit 68.** *Chris Smith Bio*

**Exhibit 69.** *McKinney Affidavit*

**Exhibit 70.** *START Email Thread*

**Exhibit 71.** *RFP Denied for START Pay*

**Exhibit 72.** *Text Message Exchange Between Ms. Swinton & Dr. Carter (VP of Faculty Senate)*

**Exhibit 73.** *Watson's Deposition*

**Exhibit 74.** *Adjunct Instructor Gail Richard's Affidavit*

**Exhibit 75.** *Ellison Deposition*

**Exhibit 76.** *Ms. Swinton's Head Coach Bio*

**Exhibit 77.** *Ms. Swinton's Professional Development Plan Template Drafted by Athletics*

**Exhibit 78.** *Stevenson's First Deposition*

**Exhibit 79.** *Non-credit for Transfer of Developmental Classes*

**Exhibit 80.** *Responsibility of Academic Policies Committee and Curriculum Committee*

**Exhibit 81.** *General Education Classes Required to Graduate*

**Exhibit 82**. *Chart Summer 2015*

**Exhibit 83.** *Chart Fall 2016*

**Exhibit 84.** *Chart Fall 2017*

**Exhibit 85.** *Letter to the President of the Board of Trustees.*

**Exhibit 86.** *EEOC Right to Sue Letter*

**Exhibit 87.** *PSC Catalogue with Equally Situated Male*

**Exhibit 88.** *Pulaski County Prosecuting Attorney's Letter*

**Exhibit 89.** *Staff Recommendation for Hire for Cheer and Dance Coach*

**Exhibit 90.** *Stevenson's 2020 Spring Class Schedule at PSC*

**Exhibit 91.** *– PSC Male Comradery*