**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**PATRICIA WALKER-SWINTON**                                        **PLAINTIFF**

**v.**                          **Case No. 4:18-CV-886 (KGB)**

**PHILANDER SMITH COLLEGE, AND
DR. RODERICK SMOTHERS, SR., PRESIDENT,
IN HIS INDIVIDIAL AND OFFICIAL CAPACITY,
AND DR. ZOLLIE STEVENSON, JR., VICE-PRESIDENT,
ACADEMIC AFFAIRS, IN HIS INDIVIDIAL AND
OFFICIAL CAPACITY**                                        **DEFENDANTS**

<u>**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS**</u>

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

Plaintiff by and through her undersigned counsel, hereby submits her Amended Response

to Defendants Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

**A.**     <u>**Background Information Regarding Plaintiff's Employment Relationship**</u>

<u>**with the College**</u>

1.     Plaintiff was hired by the College as an English instructor in 2011. *Dkt. 1* ¶¶ 19 &

Response:     Deny. In 2011, Ms. Swinton was initially hired as an English and reading

coach. (Ex. 3A. Contracts)

*2.*     Plaintiff's employment with the College was governed by a term (non-tenure)

Faculty Contract. <u>**Exhibit 1**</u>, *Swinton Depo.* P. 221:19–25; <u>**Exhibit 2**</u>, *Plaintiff's Faculty Contract*

*from 2012-2018.*

Response:     Admit.

*3.*     "The appointments of term faculty personal are at-will, and personnel may be

terminated by the College prior to the expiration of the original contract period as described in

Dismissal for Cause, or as otherwise set forth in their contract." **Exhibit 3**, *Excerpts of the College's Faculty Handbook*, at P. 42.

Response:     Deny. None of the reasons for "Cause" listed in the faculty handbook or Ms. Swinton's contract were the reasons given in the letter of termination. (Ex. 38**.** Termination Letter).

4.     "In the case of faculty who are serving on term appointments, there is neither an expectation nor a guarantee of reappointment beyond the terms of their contract." *Id.* at P. 48.

Response:     Deny.

5.     Under the terms of her Contracts, Plaintiff was duty-bound to comply with the College's policies contained in its Faculty Handbook, Course Catalog, presidential proclamations, or future policy publications—including the College's prohibitions against harassment and discrimination. *Ex.* 2, at Bates 2, 5, 11, 16, 22, 25; *Ex. 3*, at P. vi, 1–3, 59–60.

Response:     Deny.  Plaintiff did not violate any policies.

6.     The College's mission is to graduate academically accomplished students who are grounded as advocates for social justice, determined to change the world for the better. *Ex.* 3, at P. 1–3.

Response.     Admit.

7.     The College prohibits harassment and discrimination on the bases of race, color, gender, religion, national origin, ancestry, age, marital status, disability, sexual orientation, veteran status, or any other protected status in all of its activities. *Id.* at P. vi, 1–3, 59–60.

Deny. The college discriminated against plaintiff. Further the college did not prohibit the male student from harassing the plaintiff.

8.     The Faculty Handbook is publicly available on the College's website. *Faculty Handbook*, Philander.edu, https://www.philander.edu/employee-documents (last accessed June 4, 2020).

Deny. The Faculty Handbook for 2017-2018 was not available on the website

*9.*     Plaintiff testified that she wrote the coding for the College's website. *Swinton Depo.* (Ex. 1) P. 201:8.

Deny.  Mis characterization of plaintiff's testimony.

*10.*     Plaintiff acknowledged that the College also prohibits retaliation against any individual for making a good-faith complaint regarding discrimination. **Exhibit 4**, *Plaintiff's Policy Acknowledgement Forms*.

Response:     Deny.

*11.*     While she could not recall receiving the College's equal employment opportunity-oriented policies, Plaintiff testified that it was possible that she received those documents, *Swinton Depo.* (Ex. 1) P. 154:5–11, 155:10–11, which is reflected in Plaintiff's executed acknowledgement that she received those policies. *Ex. 4.*

Response:     Deny.

*12.*     The College's anti-discrimination policies—along with its Course Catalog and Student Handbook—also apply to preclude discrimination or harassment against students at the College. *Ex. 3*, at P. 59–60; Ex. 5, *Excerpts of the College's Catalog (Approved Feb. 16, 2018)*, at P. 3 & 17; Ex. 6, *Excerpts of the Student Handbook*, at P. 23 & 34; *see also* Ex. 29, *Philander Smith College Commitment to Accessibility*.

Response:     Deny.

13.     The Faculty Handbook defines harassment as including "the use of words, signs, jokes, pranks, intimidation, physical contact, or violence. . . Speech or other expression constitutes harassment if it is: "[i]ntended to insult or stigmatize an individual or an identifiable group of individuals on the basis of age, ancestry, disability, national or ethnic origin, race, religion, gender, or sexual orientation;" or "[a]ddressed directly to (though not necessarily in the

presence of) the individual(s) whom it insults or stigmatizes[.]" *Id.* at P. 59.

Response:     Deny.

**B.     Events Leading to Plaintiff's Termination**

*Classroom Incident*

14.     On April 9, 2018, Plaintiff administered a quiz in her morning English composition class. *Swinton Depo.* (Ex. 1) P. 136:11–17; **Exhibit 7**, *Plaintiff's Statement of Incident*.

Response:     Deny.

15.     Plaintiff told a student, John Doe (J.M.), to put his cell phone away. *Ex. 7*, at Bates 79.

Response:     Deny.

*16.*     After John finished his quiz, Plaintiff alleged that he resumed using his cell phone, which prompted her to take his quiz and allow John to exit the classroom. *Id.*

Response:     Deny.

17.     After the time allotted to complete the quiz expired, Plaintiff stated that she addressed her class, which included Jane Doe (T.G.), John's girlfriend, and said "no instructor would let anyone use their damn phone during a fuckin quiz or test," and that "it was insane and retarded for anyone to think it was ok." **Exhibit 8**, *Text Messages with Students*, at Bates 235.

Response:     Deny.

*18.*     Plaintiff alleged that Jane responded to this statement and asked if anyone who remained in the classroom used their phones, *Ex. 7*, at Bates 79, to which Plaintiff responded, "if it doesn't apply to you, then there is no need to respond because I have the floor." *Id.*

Response:     Deny.

*19.*     Jane told Plaintiff that her comments were disrespectful. *Id.*

Response:     Deny.

*20.*     John was waiting outside the classroom for Jane to finish her quiz so that the pair

3

could proceed to their next class. *Id.*

Response:     Deny.

21.     When Jane exited the class, she told John that Plaintiff called him a "fucking

retard," which prompted him to reenter the class and tell Plaintiff to "say it to [his] fucking face"

while referring to her as "all types of bitches." **Exhibit 9**, *Report of Chief Arthur Williams*, at Bates

588; **Exhibit 10**, *Excerpts of Student Statements Drafted at Plaintiff's Direction*, at P. 1–

2 (Bates 785 & 783).

Response:     Deny.

22.     Jane and John Doe both reported that Plaintiff referred to John as a "fucking retard."

*Ex. 9*, at Bates 585, 588.

Response:     Deny.

*23.*     Video taken by a student in the classroom demonstrates that Plaintiff and John were

several feet apart, and that another student had to restrain Plaintiff while Jane moved John Doe

into the hallway. **Exhibit 11**, *Video of Classroom Incident.*

Response:     Deny.

*24.*     No one was physically harmed during the events in Plaintiff's classroom. *Id.*

Response:     Deny.

25.     After the classroom incident subsided, Plaintiff called Ms. Des'Ree Ellison,

Administrative Assistant in the Office of Academic Affairs, and asked her to call Campus Security.

*Ex. 7*, at P. 2.

Response:     Deny.

26.     Plaintiff's son and daughter, C.S. and S.S., were students at the College, and S.S.

held a work-study position in Ms. Ellison's office area. *Swinton Depo.* (Ex. 1) P. 181:16–182:9.

Response: Deny. Plaintiff does not have any knowledge relating to any near fight and/or

any cafeteria fight between any students. Ms. Swinton was not present, did not direct, did not

4

assist, did not request any student to be engaged in any fighting or any unlawful activity. There is no evidence from John Doe (J.M. or Mar Doe (T.G.) or any other persons identifying Ms. Swinton as a participant in the alleged unlawful conduct which is being asserted by the defendant. Further, K.C., A.P., J.W. have testified that Ms. Swinton was not a participant or creator in untoward conduct. *Swinton Deposition* (Ex. 3). *Swinton Deposition* (Ex. 3). *Affidavit of AP* (Ex. 4). *Affidavit of KC* (Ex.5). *Affidavit of JW* (Ex. 6).

### *Near-Fight Between Plaintiff's Children and John and Jane Doe in the Library*

**27.**     At around 10:30 a.m. on April 9, 2018, while John and Jane were in their next class, a security officer arrived on the second floor of the library and met Plaintiff and later John. **Exhibit 12**, *Statement of Officer Gaines*.

Response:     Deny. Plaintiff cannot attest to Officer Gain's statement.

*28.*     Around that time, Plaintiff's children arrived and her son asked John, "did you disrespect my mother?" *Id.*

Response:     Deny. Plaintiff has no knowledge of that conversation and cannot attest to Officer Gain's statement.

*29.*     John answered, "yes [he] did because [Plaintiff] disrespected [him]." *Id.* Plaintiff's son then "went after [John Doe] in an aggressive manner and [Plaintiff] grabbed her son and [Officer Gaines] grabbed [John Doe] and took him downstairs." *Id.*

Response:     Deny. Plaintiff has no knowledge of that conversation and cannot attest to Officer Gain's statement.

**30.**     Plaintiff pleaded with her son not to fight, and Officer Gaines was able to diffuse the situation. **Exhibit 13**, *Statement of Teresa Ojezua, Library Director, Dated April 9, 2018*.

Response:     Deny. Plaintiff cannot attest to what Teresa Ojezua said in her statement.

**31.**     Thereafter, John and Jane were escorted to the security building where they met

with Dr. Dakota Doman, the College's then-Vice President of Student Affairs and Enrollment Management. *See Ex. 9*, at Bates 586; *Ex. 12*; **Exhibit 14**, *Statement of Dr. Dakota Doman*.

Response:    Deny. Plaintiff cannot attest to the statements of Gaines, Dr. Doman, cafeteria workers, or T.G. statements.

32.    After about a thirty-minute interview during which Dr. Doman told John that he was wrong for cursing at Plaintiff—conduct for which John would eventually face the student judicial board, *id.*—John and Jane proceeded to the Titus Building to meet with their advisor for the purposes of registering for summer classes. *Ex. 9*, at Bates 586; *Ex. 14*.

Response:    Deny. Plaintiff cannot attest to what Dr. Doman said in his statement.

### *Near-Fight in the Titus Building Between John Doe and Plaintiff's Son*

33.    When John and Jane Doe arrived at the Titus Building, a near-fight almost occurred when John Doe and C.S. crossed paths. *Ex. 14*, at Bates 586.

Response:    Deny. Plaintiff cannot attest to speculation.

34.    Ms. Ellison, who walked into the Titus Building with John and Jane Doe following behind her, interceded and placed John and Jane in the waiting area of the Academic Affairs office suite, which was located adjacent to a glass partition. *Id.* at Bates 586; **Exhibit 15**, *Statement of Des'Ree Ellison*.

Response:    Deny. Plaintiff cannot attest to what Ellison said in her statement.

35.    While they were waiting for their advisor, John and Jane reported that they witnessed Plaintiff, Plaintiff's children, and three other male students who were later identified as

J.W. (Plaintiff's nephew), A.P. (Plaintiff's daughter's then-boyfriend), and K.C. (A.P.'s friend and former roommate) ascend the staircase and congregate outside of the Academic Affairs office on the second floor of the Titus Building. *Ex. 9*, at Bates 586.

Response:    Deny.

*36.*     John and Jane Doe reported that after Plaintiff pointed them out to her companions, the three male students walked up to the glass partition and stared at John. *Id.*

Response:     Deny.

37.     After they registered for classes, John and Jane proceeded to the cafeteria for lunch. *Id.*

Response:     Deny.

**The Cafeteria Fight Between J.W., A.P., K.C., and John and Jane Doe**

*38.*     Shortly after they arrived at the cafeteria, the three male students who accompanied Plaintiff in the Titus Building (J.W., A.P., and K.C.) approached John. *Id.*; **Exhibit 16**, *Video of Cafeteria Fight Dated April 9, 2018.*

Response:     Deny. Plaintiff was not involved and was not present at any cafeteria incident.

39.     J.W., Plaintiff's nephew, confronted John and said, "bitch ass n***a, what's this shit I heard you was saying about my aunt[?]," and then he, along with A.P. and K.C., proceeded to repeatedly punch and kick John, *Ex. 9*, at Bates 589; *Ex. 16*, until various students and staff broke up the fight. *Ex. 16,* at 1m:02s.

Response:     Deny. Plaintiff was not involved and was not present at any cafeteria incident.

40.     Jane attempted to intercede during the fight, and in that process, she sustained multiple injuries as well. *Ex. 16*, at 0m:28s.

Response:     Deny. Plaintiff was not involved and was not present at any cafeteria incident.

41.     Dr. Doman suspected that Plaintiff encouraged the fight in the cafeteria. *Doman Decl.* (Ex. 17) ¶ 37.

Response:     Deny. Plaintiff was not involved and was not present at any cafeteria

incident.

C.   **The College's Investigation**

*42.*      John and Janes' families were concerned about these events and their children's safety, and they threatened the College with legal action. **Exhibit 17**, *Declaration of Dr. Dakota Doman*, at ¶ 19; **Exhibit 18**, *Stevenson Depo.* P. 298:1–20; **Exhibit 19**, *Jane Doe's Email to Dr. Smothers Dated May 10, 2018.*

Response:      Deny. Plaintiff was not involved and was not present at any cafeteria incident.

Ms. Swinton was concerned about her safety and made a formal complaint pursuant to PSC's Faculty Handbook.( Ex. 4. Affidavit of *Swinton*, Ex. 2. *PSC faculty Handbook*. Ms. Swinton disputes that there was any formal complaint made by John Doe or Jane Doe's family members. PSC did not produce any documentation related to same. Further, Jane Doe's email to Dr Smothers was from Jane Doe and not her parents. That is more erroneous information provided by PSC. There was no documentation from either Jane Doe (TG) or John Doe's (JM) family member; however, there is documentation that Ms. Swinton felt threatened. *LRPD Police Incident Report & Supplement* (Ex.88. Pulaski County Prosecuting Attorney's Warning Letter to JM)

43.      Dr. Smothers assured John and Janes' families that the College intended to complete a full investigation. **Exhibit 20**, *Smothers Depo.* P. 42:17–43:2.

Response:      Deny. Plaintiff was not involved and was not present at any cafeteria incident. Ms. Swinton disputes that Dr. Smothers had any communication with any families of JM or TG. No communication was provided to Plaintiff in discovery; however, Smothers testified that he did not participate in any investigation related to Ms. Swinton's complaint of safety. (Ex. 4. Affidavit of Swinton, Ex. 3. Swinton's Deposition, Ex. 33. Smothers Deposition, Ex. 23. Stevenson's Deposition)

44.      Dr. Doman and Dr. Zollie Stevenson, then-Vice President for Academic Affairs,

were charged with completing the investigation on the events that transpired on April 9, 2018. (Ex. 33. *Smothers Depo.* P. 75:13–77:13 *Smothers Depo.*

Response:     Deny. Ms. Swinton disputes that Doman and Stevenson were charged with completing the investigation related to Ms. Swinton's complaint. Defendant Stevenson falsely led Ms. Swinton to believe that he was conducting an investigation related to her complaint of being verbally assaulted and nearly physically attacked by male student JM on April 9, 2018. (Ex. 33. Smothers Deposition, Ex. 3. Swinton's Deposition, Ex. 4. Swinton's Affidavit,  Ex. 30 Student witnesses) Further, an administrative hearing was conducted at the helm of PSC's general counsel in violation of PSC policy.

45.     On the date of the incident, Plaintiff filed a police report with the Little Rock Police Department in which she alleged that John Doe "was being disrespectful towards her" and that he threatened Plaintiff, her son, and her daughter. **Exhibit 21**, *Police Report*; **Exhibit 22**, *Deposition of Chief Williams*, at P. 23:25–24:10.

Response:     Deny.

46.     Plaintiff also sought to remove both John and Jane Doe from her class because he "threatened to physically harm [her] and [Plaintiff's] family then tried to attack [her] in class, tried to attack [her] son in the library, tried to attack [her] son again in Titus, and attacked other students whom he recognized from talking to [her] son in Titus after the incident." **Exhibit 23**, *John and Jane Does' Incident Forms Dated April 9, 2018*.

Response:     Deny. Ms. Swinton disputes the allegations that she sought to remove JM and RG from her class for any reason other than the students' JM and TG verbal and threatening attacks on her directly. (Ex. 3. *Swinton's Deposition*, Ex. 22. *Student witness statements*, Ex. Ex. 3 *Swinton's Affidavit*, Ex. 43 *Affidavit of Student Witnesses*.

47.     The College granted Plaintiff's request to remove John and Jane from her class

7

without issue. *Stevenson Depo.* (Ex. 18) P. 145:12; *Doman Decl.* (Ex. 17) ¶ 20.

      Response:    Deny.

    *48.*    Plaintiff knew she had authority to request the removal of disruptive students from her class, as she did on July 10, 2017 with regard to a different student. *See* **Exhibit 31**, *Correspondence Dated July 10, 2017*.

      Response:    Deny.

    49.    Plaintiff had no further contact with John or Jane Doe after April 9, 2018. *Doman Decl.* (Ex. 17) ¶ 20.

      Response:    Deny. Ms. Swinton disputes having any contact with JM or TG after officer Gains escorted them.

    50.    During the investigation, Dr. Doman interviewed Plaintiff, numerous students, and multiple staff members. *See Ex. 9*; *Stevenson Depo.* (Ex. 18) P. 181:13–16, 195:13–16; *Doman Decl.* (Ex. 17) ¶ 24–32.

      Response:    Deny. Ms. Swinton disputes the assertion that Dr. Doman ever interviewed her. (Ex. 4. Swinton Affidavit. Further, Stevenson never testified that Dr. Doman ever interviewed Ms. Swinton. Additionally, Dr. Doman's first statement does not include any communication that he interviewed Ms. Swinton. Doman's First Statement (Ex.61. Doman's 1st Statement). Doman's Declaration does not state that he ever interviewed Ms. Swinton. (Ex. 49. *Doman's Declaration*. Dr. Doman's incredulous memory is of great concern, especially created two years after Ms. Swinton's attack in her classroom. None of Doman's June, 2020 Declaration was stated in his initial statement on April 9, 2018.

    Despite her familial relationship with J.W., *Swinton Depo.* (Ex. 1) P. 70:18–19, and despite the fact that A.P. was by that time living in Plaintiff's home because he was removed from campus due to the fighting episode, *id.* at P. 71:10–74:8, Plaintiff never disclosed the identity of the individuals who accompanied her to the Titus Building. *Doman Decl.* (Ex. 17) ¶ 24; *Swinton*

*Depo.* (Ex. 1) P. 149:23–150:2, 183:4–25, 343:8–344:8; *Stevenson Depo.* (Ex. 18) P. 209:2–6, 246:2–21.

Response:   Deny.

51.   From the video of the cafeteria fight, Dr. Doman was able to identify A.P. as one of the assailants, and A.P. was immediately suspended from the College. *Doman Decl.* (Ex. 17) ¶ 21.

Response:   Deny. Ms. Swinton does not have any personal knowledge about a video of a cafeteria fight nor was she involved in a cafeteria fight. (Ex. 4. Swinton's Affidavit, Ex. 3. Swinton's deposition. Further Dr. Doman's declaration of June 2020 alarmingly comes two years following Ms. Swinton's attack in the classroom by student JM. Surprisingly in Doman's declaration, he mysteriously creates information that he had not provided in his first statement following her attack April 9, 2018.

52.   Plaintiff "didn't make it home until after 8 [on the date of the incident[,]" *Ex. 8*, at Bates 231, but she could not recall whether or not she assisted A.P.—who was then staying at her house and who was in her office area on the evening of April 9, 2018—with his statement seeking an appeal of his suspension. *Swinton Depo.* (Ex. 1) P. 184:9–17; **Exhibit 24**, *Statement of A.P. Dated April 9, 2018.*

Response:   Deny.

53.   As the investigation continued, the College determined that J.W. and K.C. also perpetrated the attack against John and Jane Doe. *Doman Decl.* (Ex. 17) ¶ 32.

Response:   Deny. Ms. Swinton was not involved in any attack on JM or TG. (Ex. 4. Swinton's Affidavit, Ex. 27. AP Affidavit, Ex 28. KC Affidavit, Ex. 29. JW Affidavit.  Further Ms. Swinton has no knowledge or involvement in any disciplinary actions related to any students. (Ex. 4. Swinton's Affidavit).

54.   Plaintiff's son (C.S.), her nephew (J.W.), her daughter's boyfriend (A.P.), her

daughter's boyfriend's roommate (K.C.), and John Doe were all charged with violations of the
Student Handbook for their conduct on April 9, 2018. **Exhibit 25**, *Statement of K.C. Dated  April
16, 2018*; **Exhibit 26**. *Findings of the Student Judicial Conduct Board*.

   Response:  Deny. Ms. Swinton was not involved in any attack on JM or TG. (Ex. 4.
Swinton's Affidavit, Ex. 27. AP Affidavit, Ex 28. KC Affidavit, Ex. 29. JW Affidavit).  Further,
Ms. Swinton has no knowledge or involvement in any disciplinary actions related to any
students. (Ex. 4. Swinton's Affidavit.)

   *55.*  Each student received disciplinary action. *Ex. 26*, at Bates 346 (A.P.), 348 (J.W.),
350 (K.C.), 337 (C.S.) and 336 (John Doe).

Response:  Deny. Ms. Swinton was not involved in any attack on JM or TG. (Ex. 4. Swinton's
Affidavit, Ex. 3. Ex. 27. AP Affidavit, Ex 28. KC Affidavit, Ex. 29. JW Affidavit.  Further Ms.
Swinton has no knowledge or involvement in any disciplinary actions related to any students. (Ex.
4. Swinton's Affidavit).

   *56.*  Issues pertaining to student misconduct are typically addressed through the
College's student judicial process that has "various layers of penalties . . . [for where] a student is
found guilty of that conduct." *Smothers Depo.* (Ex. 20) P. 38:6–20.

     Deny. Ms. Swinton was not involved in any attack on JM or TG. (Ex. 4. Swinton's
Affidavit, Ex. 27. AP Affidavit, Ex 28. KC Affidavit, Ex. 29. JW Affidavit.  Further Ms.
Swinton has no knowledge or involvement in any disciplinary actions related to any students.
(Ex. 4. Swinton's Affidavit.)

   *57.*  Dr. Doman and Dr. Stevenson learned during the investigation that Plaintiff
directed numerous students to provide written statements in support of her version of events and
deleted evidence of that conduct. *See Ex. 8*; *Doman Decl.* (Ex. 17) ¶ 28–29; *Stevenson Depo.* (Ex.
18) P. 250:6–12.[1]

Response:     Deny. Ms. Swinton disputes directing any students to provide her versions of the classroom incident. (Ex. 4. Swinton's Affidavit. Ex. 3 Swinton's Depo., Ex. 22. Student witness statements, Ex. 48. Student Affidavits.

58.     For instance, Plaintiff directed a student in her class, T.J., as follows: "[D]o another statement that points out that I was talking to the class about paying attention and following directions and that no instructor would let anyone use their damn phone during a quiz or test and that it was retarded for anyone to think it was okay. That's basically what I said. And point out that he wasn't the only one who acted up bc another student came in late to take the quiz then wrote all over it so i took it from her and then she got mad but didn't act out like he did. So after the quiz i addressed the whole class but his girlfriend got mad and started being disrespectful to me as she always is before leaving out. And if you have been there other times when they were rude to me will you point that out too? And point out the threats he kept making calling me a bitch and how he was going to slap my ass and when he said he was about to beat me ass[.]" *Ex. 8*, at Bates 197.

Response:     Deny. Ms. Swinton disputes the assertion that she directed any student to provide a false statement related to the classroom incident wherein she was attacked. *(Ex. 3. Swinton's Deposition* (Ex. 3, Ex. 4. *Swinton's Affidavit, Ex. 27. Affidavit of AP, Ex. 28. Affidavit of KC, Ex. 29. Affidavit of JW).*

Further, PSC's Exhibit 8 at Bates 197 is the text message that Plaintiff asserts PSC's general counsel took without permission from her cellular telephone during the administrative hearing on April 10, 2018. (Ex. 3. *Swinton's Deposition,* Ex. 4. *Swinton's Affidavit.* Ex 30. Affidavits of Student Witness outside the administrative hearing).

For clarification, the text messages that were unlawfully taken from Ms. Swinton's phone consisted of a group chat meeting specifically related to that Composition I class where

assignments were given. Pursuant to Officer Gains' directive, Ms. Swinton requested student statements. (Ex. 25. Gains Affidavit.

59.     Plaintiff also directed T.A., another student in her class, to provide a revised statement that contained the following information: "Can you do another statement that points out that I was talking to the class about paying attention and following directions and that no instructor would let anyone use their damn phone during a fuckin quiz or test and that it was insane and retarded for anyone to think it was ok. That's basically what I said. And point out that he wasn't the only one who didn't follow directions and got mad so it was only right for the entire class to be addressed but his girlfriend got mad and started talking rudely to me before leaving out to find him. And if you have been there other times when they were rude to me will you point that out too?" *Id.* at Bates 235–36.

Response:     Deny. Ms. Swinton disputes directing TA to provide false information. Openly in the group chat dialogue—which was taken from Ms. Swinton's cellular phone – without permission- during the administrative hearing—Ms. Swinton requested that all students provide complete facts with specific language related to the classroom incident that ensued.

60.     In a conversation with E.C., another student in her class, Plaintiff told him to "write up another statement with more details and what you witnessed him doing when he rushed into the class like he was about to attack me?" *Id.* at Bates 221.

Response:     Deny. Ms. Swinton disputes directing TA to provide false information. Openly in the group cat dialogue—which was stolen from Ms. Swinton's cellular phone during the administrative hearing—Ms. Swinton requested that all students provide complete facts with specific language related to the classroom incident that ensued.

61.     Plaintiff also apparently could not recall whether she referred to John as a "stupid motherfucker," and she queried her class as to whether she used that phrase. *Ex. 8*, at Bates 194

("Class, did I anytime call [John Doe] a 'stupid motherfucker' in class?"), *c.f. id.* at Bates 229 ("You said 'fucking' and called his girlfriend disrespectful."); *see also Ex. 9*, at Bates 585.

Response:    Deny.

62.    Dr. Stevenson and Dr. Doman determined that Plaintiff was not forthcoming about the extent to which she directed her students to re-write their statements to support her narrative despite the continued threat of legal action by John and Jane Does' families. *Doman Decl.* (Ex. 17) ¶ 28; *Stevenson Depo.* (Ex. 18) P. 184:11–185:21, 208:16–209:8, 250:6–12; **Exhibit 27**, *Termination Letter Dated June 27, 2018*.

Response:    Deny. Ms. Swinton disputes any assertions that she directed any students to write any false or misleading statements. (Ex. 3. *Swinton's Deposition*, Ex. 4. *Swinton's Affidavit*, Ex. 48. *Student Affidavits*.

63.    The College also learned that Plaintiff altered Ms. Ellison's statement. *Stevenson Depo.* P. 254:16–255:14; **Exhibit 30**, *Ellison Depo.* P. 37:3–38:15.

Response:    Deny. Ms. Swinton disputes allegations that she altered Ms. Ellison's statement.  (Ex. 4. *Swinton's Affidavit*, Ex. 75. Ellison Deposition)

64.    When asked if she thought it was appropriate to use the word "retard" in addressing her class, Plaintiff stated that, in her opinion, "retarded" was an appropriate term. *Ex. 21*; *Doman Decl.* (Ex. 17) ¶ 27; *Stevenson Depo.* (Ex. 18) P. 230:13–19, 232:1–233:21.

Response:    Deny. Ms. Swinton disputes the use of referring to JM as a retard or retarded. Swinton's deposition (Ex. 4. Swinton's Affidavit, Ex. 22. Student witness statements).

 John, it should be noted, has a learning disability or "exceptionality." *Stevenson Depo.* (Ex. 18) P. 260:3–5; *Smothers Depo.* (Ex. 20) P. 30:12–19.

Response:    Deny. Ms. Swinton disputes that JM has or has ever been diagnosed with a learning disability or exceptionality. PSC has not provided any documentation otherwise although Plaintiff requested through subpoena documentation of JM having a learning disability.

10

PSC has motioned the court to quash subpoenas and other discovery efforts of Ms. Swinton. (Ex. 17) *Subpoena to Office of Disability Services, Ex. 18. Subpoena to Office of Registrar Technology Department Subpoena*, Ex. 4. *Swinton's Affidavit.* (Exhibits 17 and 18 are placed under seal pending ruling on the Plaintiff's motion to unseal documents.)

65.     Dr. Smothers recruited John and Jane Doe to the College and promised their families that he would keep them safe and not allow John's perceived deficiencies to hinder his academic progress. *Smothers Depo.* (Ex. 20) P. 42:18–23.

Response:     Deny. Ms. Swinton disputes that Dr. Smothers recruited JM and TG to the college. (Ex. 41. *Duvall Affidavit,* Ex. 60. *Duvall Deposition*).   .

68.     Dr. Smothers considered Plaintiff's conduct—referring to John Doe's behavior as "retarded"—as a violation of his promise to John's parents. *Smothers Depo.* (Ex. 20) P. 42:23–43:2.

Response:     Deny. Ms. Swinton disputes that Smothers considered Ms. Swinton's comments of referring to any student's behavior of "retarded" a violation of PSC's policy. Smothers in his deposition stated "...[Ms. Swinton] called one of my students a retard that I had worked very hard to recruit to this college and then guaranteed them and their parents that not only would allow what many perceive as their deficiencies to not hinder them, that I would keep them safe. And I considered Ms. Swinton's actions to be a violation of what I had promised that student and that parent...." Ms. Swinton disputes calling JM or any other student a retard. (Ex. 3. Swinton Deposition, Ex. 22. Student Witness Statements, Ex. 48. Affidavit of Student Witnesses).

69. Plaintiff testified that she believed it was acceptable to use the term "retarded" because the students at the College are "urbans." *Swinton Depo.* (Ex. 1) P. 130:16, 162:25–163:1.

Response:      Deny. Ms. Swinton disputes that she testified that she believed it was acceptable to use the term "retarded" because the students at the College are "urbans." The defendants have taken Ms. Swinton's testimony out of context.  (Ex.3,  Swinton Deposition).

70.  The College completed its investigation, and in addition to disciplining all students involved (*Ex. 23 & 26*), because Dr. Stevenson determined that Plaintiff's conduct violated the College's anti-discrimination policies and then failed to provide material cooperation during her interview, he made the ultimate decision to terminate her employment by declining to renew her Faculty Contract. *Ex. 27*; *Stevenson Depo.* (Ex. 18) P. 38:8–9, 229:9–230:10, 232:1–12, 246:6–20.

Response:      Deny. Ms. Swinton disputes that the college completed a thorough investigation involving her complaint of being attacked in her classroom by student J.M.  (Ex. 3. *Swinton's Depo*., Ex. 4.  *Swinton's Affidavit*. In addition, on June 27, 2018, PSC, by letter, informed Ms. Swinton that "specifically, [her] employment with the College is, effective immediately, hereby terminated for cause."  (Ex. 38. Termination Letter).

Further Defendant Stevenson's statement that Ms. Swinton's employment was terminated by declining to renew her faculty contract is a misnomer. Dr. Stevenson specifically stated in his letter of termination for cause. (Ex. 38. *Termination Letter*).  Ms. Swinton disputes that Dr. Stevenson made the ultimate decision to terminate.

71. Dr. Smothers is the President of the College and he accepted Dr. Stevenson's recommendation for termination. *Smothers Depo.* (Ex. 20) P. 24:3–7.

Response:      Deny. Ms. Swinton disputes that Dr. Smothers played a meniscal role in the termination of Ms. Swinton for cause. Swinton's Affidavit (Ex. 42).

72.     Dr. Smothers believes that "context is everything" with respect to appropriateness of using "curse language" in front of students. *Id.* at P. 50:25–51:6.

Response:      Deny. Ms. Swinton disputes that Dr. Smothers believes that using

"curse language" in front of students is inappropriate. Smothers used "curse language" on three

documented occasions—Freshmen Orientation, Honors Convocation, and START New Student

Orientation. (Ex. 3. Swinton Deposition, Ex. 4. Swinton Affidavit, Ex. 5. Ervin Affidavit, Ex. 39.

Affidavit of TW, Ex. 33. Smothers Deposition, Ex 21. Affidavits of Former Panther Dolls,

73.     For instance, "in an open orientation session in front of students and parents," Dr.

Smothers said that if he found students violating the College's standards of student conduct, such

as carrying a weapon on campus, he was going to "put [their] a-s-s-e-s on a bus and send [them]

back home to [their parents,]" which elicited a "standing ovation" from the parents in attendance.

*Id.* at 51:4–52:1.

Response:     Deny. Ms. Swinton disputes that Smothers abhorred students

violating PSC's standard of student conduct for committing criminal acts, when JM threatened to

"Beat" Ms. Swinton's "ass" and threatened to "slap the fuck out of [Ms. Swinton]." Defendant

Smothers condoned JM's criminal activity and did not put him on a bus back home to his

parents. Instead, in May of 2018, less than one month of JM threatening Ms. Swinton, Smothers

hired JM for pay to work in his office. Even more alarming, Defendant Smothers hired, for pay,

JM to work in the START program to work as a tutor/mentor to assist students with deficiencies.

It is important to note that the students who are selected as mentors and tutors are students who

have attained high academic achievements. None of the tutors in the START program have been

identified as having documented learning disabilities or exceptionalities. Further, JM transferred

to PSC in January 2018 from Grambling State University and never was a student in the START

program prior.

74.     Dr. Smothers believes that the context in which Plaintiff used the term retarded in

addressing her class "was different" because "[h]er context was speaking negatively to a student

who had a challenge based on his scores in front of a class of peers so as to embarrass [him]." *Id.*

at P. 52:1–6.

      Response:     Deny. Ms. Swinton disputes that she spoke "negatively to a student who had a challenge based on his scores in front of a class of peers so as to embarrass him." Specifically, JM was not in the class when Ms. Swinton was talking to her class. JM had already left the room when he was confronted by Ms. Swinton for inappropriate use of a cellular device while testing was ongoing. (Ex. 3. *Swinton Affidavit, Ex. 3. Swinton Deposition, Ex. 22. Student Witness Statements*, Ex. 48. Student Witness Affidavits Ex. 90, TA Affidavit. In addition, PSC did not provide Ms. Swinton any documentation that JM had any deficiency. (Ex. 3. Swinton deposition, Ex. 4. Swinton Affidavit. Also, Ms. Swinton requested documentation by subpoena reflecting JM's disability to which PSC motioned the court to suppress and same is pending.

     75. Dr. Smothers testified that "[t]here's a difference between an environment of setting context where you're encouraging good behavior and then an environment where a student is supposed to feel safe and an environment where learning is supposed to be occurring . . ." *Id.* at P. 52:7–22.

      Response:     Deny. Ms. Swinton disputes her use of an urban terminology as being used in a different context than that which Defendant Smothers uses frequently when he is angry with students or to make a point. Ex. 4 Swinton Affidavit, Ex. 39. Affidavit of Student T.W., Ex. 33. Smothers Deposition P. 51:18-19, P. 51:21-22..

     76. While Dr. Smothers would not find the context of using the word "ass" in outlining expectations of student conduct at a new student orientation in front of the students' parents to be improper, he believed that Plaintiff's decision to use the phrase "fuckin retarded" during her class on April 9, 2018 to be a terminable offense because these were two different contexts. *Id.* at P. 52:17–22.

      Response:     Deny. Ms. Swinton did not say "fuckin retarded" during her class on April 9, 2018. Exhibit 26. *Swinton Complaint Packet to Academic Affairs* P. 5).

77.     No one on President Smothers' Executive Committee has ever recommended terminating any faculty member, other than Plaintiff, for using offensive language towards a student. *Id.* at P. 66:16–22.

Response: Admit.

*78.*     Dr. Stevenson issued Plaintiff a non-renewal letter explaining the reasons for her discharge on June 27, 2018. *Ex. 27.*

Response: Deny. Stevenson issued Ms. Swinton a termination letter for causes outlined in the termination letter based on an incomplete investigation. (Ex. 38.*Termination Letter.*

79.     Plaintiff never filed a grievance with the Faculty Grievance Committee of the Faculty Senate. *Stevenson Depo.* (Ex. 18) P. 113:11–15.

Response:     Deny. Ms. Swinton complained numerous times to the VP of Academic Affairs and to HR following the process outlined in the PSC Handbook Policy. Further, Ms. Swinton contacted the VP of Faculty Senate, Dr. Carla Carter and asked her what the steps were for filing a grievance because it only outlined the steps for tenured faculty. Dr. Carter stated that she would get back with Ms. Swinton, but she did not. (*Exhibit 4. Swinton's Affidavit, Exhibit 72. Text Message Exchange Between Ms. Swinton & Dr. Carter (VP of Faculty Senate).*

80.     The Faculty Grievance Committee is a standing committee of the Faculty Senate. *Ex. 3*, at P. 16.

Response:     Admit.

81.     Plaintiff served as Secretary of the Faculty Senate at the time of her termination. *Stevenson Depo.* (Ex. 18) P. 106:16–17.

Response:     Deny. Ms. Swinton was not secretary of the Faculty Senate at the time of her termination. (Exhibit 33. *November 30, 2017 Faculty Senate Minutes).*

82.     The Secretary of the Faculty Senate typically sends the College's administration lists of individuals on each of the Faculty Senate Committees. *Id.* at P. 108:18–21.

14

Response:      Admit.

83.     Plaintiff never complained about gender-based discrimination during the course of the investigation. **Exhibit 32**, *Text Messages Between Plaintiff and Z. Stevenson*; **Exhibit 33**, *Correspondence Exchanged Between Z. Stevenson and Plaintiff on April 15 and 26, 2018.*

Response:      Deny. Ms. Swinton was complaining about gender-based discrimination since her 2014 communication exchange with Terry Wallace, VP of Fiscal Affairs at that time.  (Ex. 52-55. *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and Dance Teams and its Members,* Ex. 53-53. *Emails of Various Complaints.* Exhibit 56. *Greenwood's Text Message Exchange with Ms. Swinton.*

84.     Plaintiff testified that she believes the College was "trying to get over on [her]," but she stated that she did not know if she thinks that her gender played any role in her perceived treatment. *Swinton Depo.* (Ex. 1) P. 404:24–405:3.

Response:      Deny. Misrepresentation of facts.

*85.*    On June 25, 2018, Jane Doe emailed Dr. Smothers in following up on her complaint against Plaintiff. **Exhibit 34**, *Additional Correspondence Between Jane Doe and Dr. Smothers Through June 25, 2018.*

Response:      Admit.

86.     Plaintiff testified about her belief that her termination was retaliatory because she "went and told the Prosecuting Attorney's office what happened." *Id.* at P. 413:14–414:6, 415:10–13.

Response:      Deny. Misrepresentation of facts. Ms. Swinton stated that she was terminated days after the prosecuting attorney's office mailed out the "Warning Letter" to student JM for terroristic threatening. Further, Ms. Swinton told Philanders Attoney, Abtin Mehdizadegan that he told her not to tell anyone about what happened to her and that Abtin Mehdizadegan threatened to have her terminated if she did not give him her phone, but she told the prosecuting attorney's office and did not give Abtin Mehdizadegan her phone, instead he took it from her.(Exhibit 3. *Swinton Deposition* P. 414:4-6, P.

14

149:6-9, P. 215:9-10).

87.     Plaintiff testified that the Prosecuting Attorney's office issued a cease and desist

letter to John Doe one day before her termination. *Id.* at 415:24–416:4.

> Response:     Deny. Ms. Swinton stated that she received a copy of the letter from the

prosecuting attorney's office that was sent to student JM and that student JM was working in the President

Smother's Office at the time he received the letter from the prosecuting attorney. Ms. Swinton further

testified that the next day after JM received his letter, she was terminated for reasons outlined in the

contract related to JM.  (Exhibit 3. Swinton Deposition. P.415:24-25, P. 416: 1-4).

88.     The College typically processes contract renewals in mid-to-late June, or about

three months prior to the expiration of the termination of the Faculty Contract. *See Ex. 27, 38*; *see*

*also Ex. 2*, at Bates 1.

> Response:     Deny. In 2016, Smothers started issuing contracts in May. Smothers did

not issue Ms. Swinton's contract for 2017-2018 school year until October 17, 2017. (Ex. 3A *Ms. Swinton's*

*Contracts.)*

89.     Dr. Stevenson never even received a copy of Plaintiff's police report. *Stevenson*

*Depo.* (Ex. 18) P. 165:9–19.

> Response:     Deny. Ms. Swinton sent an email to Stevenson, Smothers, Chief Williams,

her supervisor Sheer, Doman, and others with the police report number as instructed by Chief Williams in

the same email that Ms. Swinton sent a copy of her complaint about the threats made upon her by student

JM. (Ex. 4. *Swinton's Affidavit.)*

90.     Plaintiff has no knowledge of whether other professors at the College ever used the

phrase "it is retarded" in addressing their students. *Swinton Depo.* (Ex. 1) P. 382:6–14.

> Response:     Deny. Ms. Swinton cannot attest to what anyone says in their classroom.

91.     Plaintiff alleged that President Smothers, Chris Smith (Director of the S.T.A.R.T.

Program and Special Assistant to the President, *Doman Decl.* (Ex. 17) ¶ 48), Dr. Stevenson, and

Ms. Ellison used intemperate language and did not receive disciplinary action. *Swinton Depo.* (Ex.

1) P. 141:12–16, 150:13–15, 405:20–406:3.

> Response: Deny. Misrepresentation of facts. Ms. Swinton did not say that Ms. Ellison and Stevenson used severe language. (Exhibit 3, *Swinton Deposition.* P. 141:12–16)

92. Dr. Smothers, as President of the College, reports to the College's Board of Trustees. *Id.* at P. 12:9.

> Response: Admit.

93. Dr. Smothers testified that Chris Smith never used abusive language in his presence. *Id.* at P. 54:23–55:5.

> Response: Admit. Dr. Ervin's Affidavit refutes that testimony. (Exhibit 5. *Ervin Affidavit)*

94. Ms. Ellison testified that she never heard Mr. Smith direct intemperate language towards Plaintiff. *Ellison Depo.* (Ex. 30) P. 29:16–18.

> Response: Deny. Ms. Ellison testified that she was not at the meeting when Chris Smith used abusive language. (Exhibit 75. *Ellison Deposition.* P. 29:16-18

95. Dr. Doman, in his sworn declaration testimony, stated that he has never heard Mr. Smith use any inappropriate language against another employee. *Doman Decl.* (Ex. 17) ¶ 48.

> Response: Admit. However, Dr. Doman was not employed at Philander in summer 2015 when Chris Smith used curse language towards Ms. Swinton in a meeting. (Ex. 49. *Doman's Declaration)*

96. Dr. Stevenson, who reported to the President in his capacity as Vice President for Academic Affairs, was Plaintiff's supervisor. *Smothers Depo.* (Ex. 18) P. 25:20, 62:1–5.

> Response: Deny. Stevenson was not Ms. Swinton's direct supervisor. (Exhibit 23. *Stevenson's Second Deposition* P. 85:13-15, P. 86:1-2).

97. Dr. Doman, in his sworn declaration testimony, stated that he has never heard of

any professor referring to a student's conduct as "retarded," and that he has never heard Dr.

Smothers or Dr. Stevenson use that language. *Doman Decl.* (Ex. 17) ¶¶ 45–47.

> Response:   Admit. Dr. Doman would have been in attendance at the freshmen

orientations and 2018 Honors Convocation when Smothers used curse language directed at the students.

(Ex. 33. *Smothers Deposition* P. 51:19*, Ex. 39. Affidavit of Student T.W.)*

98.    Ms. Ellison was a non-instructional administrative assistant and she reported to Dr.

Stevenson. *Stevenson Depo.* (Ex. 18) P. 55:17–56:1.

> Response:   Deny. Stevenson testified that Ms. Ellison was his Executive Assistant

and also handled a lot of the student interactions. (Exhibit 23 Stevenson's Second Deposition (P. 56:1-7,

15-17).

99.    Plaintiff believes her use of the word "retarded" was appropriate because she "used

it in the same context as the Urban Dictionary uses the same word in the same context." *Swinton*

*Depo.* (Ex. 1) P. 114:12–15.

> Response:   Deny. Misrepresentation of facts. Ms. Swinton stated that she used words

in the same urban context as Smothers had been doing. (Ex. 3. *Swinton Deposition* (P. 143:7-15).

100.    Plaintiff would have engaged in the same conduct in referring to a student's conduct

as "retarded" because John Doe is African American and from an urban community. *Id.* at P.

162:25–163:1, 166:1–7.

> Response:   Deny. The word urban is related to an area in a city and the language used

within that area, not necessarily African American. Exhibit 3, *Swinton Deposition.* P. 145:12-15).

Likewise, Smothers would have engaged in the same conduct with the disabled students and regular admit

students when he told them he "would put [their] asses on a bus back home," and when he told them he

"had lots of sex when [he] was [their] age." Exhibit 33. *Smothers Deposition,* (P. 51:18-19, *Exhibit 69.*

*Affidavit of Student T.W.)*

 Plaintiff admitted that Urban Dictionary describes the word "retarded" as the number-one trigger

for individuals on social media. *Id.* at P. 133:24.

15

Response:     Deny. Misrepresentation of facts. Ms. Swinton testified that a random Canadian girl on the internet said the word retarded was the number one trigger word. Exhibit 3. *Swinton Deposition* P. 133:2-3).

101.     Dr. Stevenson testified that he would never find using the term "retarded" to be appropriate during classroom instruction or otherwise. *Stevenson Depo.* (Ex. 18) P. 294:12–15.

Response:     Deny. Although Stevenson testified to this, he has used the word retarded while in the Office suite of Academic Affairs. **Exhibit 42.** *Swinton's Affidavit.*

102.     Plaintiff believes the April 9, 2018 episode reflects one of her finest hours as an instructor. *Swinton Depo.* (Ex. 1) P. 349:2–19.

Response:     Deny. Misrepresentation of facts. Ms. Swinton testified that her "finest work is to teach students to be truthful." Exhibit 3. *Swinton Deposition* P. 349:13-16.

103.     Plaintiff has no evidence beyond her feelings to support her allegations of gender discrimination. *Swinton Depo.* (Ex. 1) P. 379:20–380:2.

Response:     Deny. Misrepresentation of facts.

**D.      Plaintiff's Charge of Discrimination**

104.     Plaintiff filed her Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) on August 21, 2018 in which she alleged that the College discriminated against her on the bases of sex and age between April 1, 2018 to August 2, 2018. **Exhibit 28**, *EEOC Charge-Related Documents.*

Response:     Agree.

**E.      Plaintiff's Compensation-Related Concerns Regarding the Panther Dolls**

105.     The College participates in a regional athletic conference called the Gulf Coast Athletic Conference (GCAC) and it is subject to the National Association of Intercollegiate Athletics' (NAIA) rules and regulations. *Student-Athlete Handbook*, PHILANDER.EDU, *available at* https://www.philanderathletics.com/d/STUDENT_ATHELETE_-_HANDBOOK_SIGNED_

.pdf (last accessed June 14, 2020).

Response:    Agree.

106.    During Plaintiff's employment, the only GCAC and NAIA-approved sports at the

College were Basketball, Cross-Country, Track and Field, and Women's Volleyball. **Exhibit 44**,

*Information Regarding Recognized NAIA Teams.*

Response:    Deny. Cheer and dance were a part of the athletic department which

is a part of the GCAC conference. (Ex. 34. *Coach Weaver's Affidavit)*

107.    Cheer and dance "was not an established sport" in the Athletics Department when

Dr. Smothers arrived in 2015. *Smothers Depo.* (Ex. 20) P. 58:8–13.

Response:    Deny. Philander Smith College always had an established cheer and dance

program under the Athletics Department. Ms. Ellison was the cheer and dance coach when she first

became employed at Philander about 12 years ago. The team had a budget when Ms. Ellison was the

coach; however, the cheer and dance team did not have a budget when Ms. Swinton was the coach

although she continuously asked for one. (*Exhibit 75. Ellison Deposition* P. 16:9-11, P. 9:16-19, P. 19:12-

17). *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and*

*Dance Teams and its Members, (Ex. 42. Panther Dolls Affidavits,* Ex. 52-53.  PSC Alumni, Ex.  9-20.

*Emails of Various Complaints)*

108.    The Panther Dolls were never recognized by the NAIA as a collegiate sport during

Plaintiff's employment. *Swinton Depo.* (Ex. 1) P. 51:17–52:11, 239:12–18, 240:3–7, 421:5–8;

*Smothers Depo.* (Ex. 20) P. 60:12–61:2.

Response:    Deny. The cheer and dance teams at Philander have always been a part of

the Athletic Department at Philander; likewise, the Athletic Department has to submit yearly paperwork to

the GCAC, which is part of the NAIA, stating whether or not the cheer and dance teams will compete. If

they agree to compete and do not, the Athletic Department is charged a fine. At the same time, if they

choose to not compete, that does not remove them from being under the umbrella of the Athletic

Department. Ms. Swinton never stated that the Cheer and Dance team was not a part of the NAIA under

Philander. (*Exhibit 3. Swinton Deposition* P. 51:17-18).

109.    Plaintiff testified that she organized the Panther Dolls cheer and dance team at the College with Coach Weaver's approval in 2012. (Ex. 3. *Swinton Depo.* (P. 32:2, 50:13–16, 246:21–25.

         Response:    Deny. Ms. Swinton testified that Philander has always had a cheer and dance team program that was organized under the Athletic Department. (Ex. 3. *Swinton Deposition*, P. 50:22-25, 51:1-7). Further, Ms. Swinton testified that she only gave the cheer and dance teams a name—Panther Dolls. (Exhibit 3. *Swinton Deposition* P. 50:18).

110.    Plaintiff created the Dolls' logo, which does not incorporate the College's actual logo. *Id.* at P. 49:15–50:18.

         Response:    Deny.

*111.*    Plaintiff registered the name "Panther Dolls" as a non-profit entity with the Secretary of State. **Exhibit 35**, *Secretary of State Information.*

         Response:    Deny. Plaintiff did not register the name "Panther Dolls" with the Secretary of State. (Ex. 35 and 36. Affidavits of *Jason Roberson.*

112.    Plaintiff was the Panther Dolls' registered agent with the Secretary of State and she served as the Dolls' only officer. *Swinton Depo.* (Ex. 1) P. 244:23–245:4.

         Response:    Deny. Plaintiff did not register the name "Panther Dolls" with the Secretary of State. (Ex. 35 and 36. Affidavits of *Jason Roberson)*

113.    Plaintiff opened a bank account with Simmons Bank on behalf of the Panther Dolls. *Id.* at P. 53:1–15.

         Response: Admit.

114.    No College administrator was a signatory on the Panther Dolls bank account. *Id.* at P. 422:4–7.

         Response: Admit

115.    Students who participated in cheer and dance paid dues and out of pocket expenses. *Smothers Depo.* (Ex. 20) P. 88:22–89:6; **Exhibit 36**, *Correspondence Dated October 3, 2016*, at Bates 16–17 ("[a] lot of us who are on the team don't have the finances to continue to pay").

Response: Deny. Philander Smith College Panther Dolls did not pay dues. (Ex. 4. *Swinton's Affidavit).*

Students who participated in the Panther Dolls complained to President Smothers that they were required to pay dues and fees to Plaintiff but that they never knew where their money went. *Smothers Depo.* (Ex. 20) P. 88:19–89:6.

Response: Deny. (Exhibit 42. *Former PSC Panther Doll Affidavits,* Exhibit 49. *Former PSC Panther Doll Email Exchange with Smothers)*

116.    Students who participated in cheer and dance were required to engage in fundraising activities. *Swinton Depo.* (Ex. 1) P. 253:12–13.

Response: Admit.

117.    Plaintiff unilaterally closed the Panther Dolls account with Simmons Bank. *Id.* at P. 53:1–15.

Response: Admit.

118.    Plaintiff determined which games her team would attend. **Exhibit 37**, *Correspondence Regarding Funding Requests for the Dolls*, at Bates 66–67.

Response: Deny. Misrepresentation of the email exchange with Terry Wallace. The cheer and dance team had to attend volleyball games and all home basketball games. *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and Dance Teams and its Members, (*Exhibit 52-55. *Emails of Various Complaint*s, Exhibit 9-20. *Emails of Various Complaints,* Exhibit 3 S*winton Deposition* P. 265:15-16).

119.    At times, Plaintiff struggled to recruit students who were interested in participating in that club. *Swinton Depo.* (Ex. 1) P. 264:1–265:4; *Ex. 37*, at Bates 68.

19

Response: Deny. The cheer and dance team at Philander was not a club but a part of the athletic department. Further, members complained about not receiving fair treatment. Additionally, this is a misrepresentation of what Ms. Swinton said in her deposition. Most students who joined Philander Panther Dolls wanted to cheer and dance not just cheer. (Exhibit 3, *Swinton Deposition*, P. 264:9-15, P. 265:6-7.)

120. Compensation for coaching the Panther Dolls was not included in the Athletics Department's budget as of January 24, 2014. *Id.* at Bates 69.

Response: Deny. The position for coaching cheer and dance was in the athletic department's budget in 2014. (Exhibit 34. *Coach Weaver's Affidavit)*

*121.* In the 2014-15 academic year, the College experienced challenging financial circumstances that required, among other things, a reduction in force. *Swinton Depo.* (Ex. 1) P. 258:22–24; *Ex. 38.*

Response: Deny. Ms. Swinton has no knowledge about the college's financial situation. Further, that was not stated by defendants as the basis of her termination in 2018. (Exhibit 42. *Swinton's Affidavit).*

122. Plaintiff was "sadden[ed]" that there was no money budgeted for the Panther Dolls in 2014. *Ex. 37*, at Bates 69.

Response: Deny. Ms. Swinton was disappointed that the cheer and dance teams were not receiving the same treatment as the male athletic teams. *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and Dance Teams and its Members,* Ex. 52-55. *Emails of Various Complaints, Ex. 3. Swinton Deposition* P.265:15-16).

123. Terry Wallace, then-Vice President for Fiscal Affairs at the College, requested a budget from Plaintiff for the 2014-15 academic year, but he did not receive a proposed budget from Plaintiff. *Id.* at Bates 42; **Exhibit 41**, *Newton Depo.* P. 27:2–19.

Response. Deny. Terry Wallace never requested a budget from Ms. Swinton.

19

However, after she had reminded him that he never requested a budget from her, she resent the budget request. (Ex. 86 – 89. *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and Dance Teams and its Members, (*Exhibit 9-20. *Emails of Various Complaints, Exhibit 3.* *Swinton Deposition* P. 265:15-16).

124. When questioned about why the Panther Dolls did not cheer-on the Women's teams, Plaintiff indicated that she could not guarantee the Dolls' attendance because they "volunteer[ed] their time and pa[id] their own money[.]" *Ex. 37*, at Bates 68.

Response. Deny. Ms. Swinton was questioned about only one basketball game where the cheerleaders did not attend. (Ex. 52-55. *Complaint Emails Between Swinton and Wallace Concerning the Unfair Treatment of the Cheer and Dance Teams and its Members,* Ex. 9-20. *Emails of Various Complaints,  Exhibit 3.* *Swinton Deposition* P.265:15-16).

125. There was no agreement under which the College was obligated to pay Plaintiff in connection with coaching the Panther Dolls. *Newton Depo.* (Ex. 41) at P. 27:16–28:6.

Response. Deny. Ms. Swinton was hired on as the cheer and dance team coach for Philander Smith College. The athletic Directors each year submitted requests for pays. Ex. 34. *Coach Weaver's Affidavit,* Ex. 89. *Staff Recommendation for Hire for Cheer and Dance Coach.* Ex. 76. *Ms. Swinton's Head Coach Bio. ,* Ex. 69. *McKinney Affidavit)*

126. A personnel action request form, even when completed by an individual's supervisor, is not a reflection that the employee will receive the extra compensation requested because that form is "just a request[.]" *Id.* at P. 52:25–53:12.

Response. Deny. Personnel Action Requests forms are also known as Requisitions by President Smothers and they are a reflection of services completed or agreed to complete in exchange for pay. Exhibit 33. *Smothers Deposition* (P. 91:4-9).

127. Serving as a faculty advisor does not necessarily entitle an employee to additional compensation. *Id.* at P. 57:6–11.

Response. Deny. Ms. Swinton was never a faculty advisor at Philander; therefore, she cannot attest to what their compensation practice would be. (Exhibit 3. *Swinton's Affidavit*)

*128.*     Plaintiff told Coach Greenwood, interim Athletic Director and Women's Basketball Coach, that she believed it was "BS that [she was] not getting [her] stipend," that she did not receive a budget, that she did not have a key to the College's athletic facilities, and that her team was expected to be at every game but had no budget. **Exhibit 42**, *Text Messages Between Plaintiff and Athletics Staff*, at Bates 128.

Response. Deny. Earlier in September, Ms. Swinton had spoken with Interim Athletic Director Greenwood previously regarding her compensation and budget for the cheer and dance teams; however, Greenwood referenced that Smothers still had not contacted him back with approval. Again, later in September, Ms. Swinton told Greenwood that she was frustrated with the unfair treatment she was receiving. (Exhibit 56. *Greenwood's Text Message Exchange with Ms. Swinton.*)

129.     Coach Greenwood directed the College's Maintenance Department to make a key to the gymnasium for Plaintiff's use. **Exhibit 49**, *Greenwood Depo.* P. 32:4–7.

Response. Deny. There is no record of Greenwood directing the college's maintenance department to give Ms. Swinton a key to the gym. Although Greenwood stated he had directed the maintenance department to give Ms. Swinton a key, Ms. Swinton's text message was to say that Head of Maintenance, Robert, stated that he was directed "not" to give Ms. Swinton a key to the gym. Ms. Swinton did not have a key to the gym. (Exhibit 56. *Greenwood's Text Message Exchange with Ms. Swinton).*

130.     Although the Dolls "functioned like a student club[,]" *Smothers Depo.* (Ex. 20)  at P. 75:9; *Stevenson Depo.* (Ex. 18) P: 81:16–19, the College attempted to accommodate Plaintiff's requests for funding and paid her stipends for her work with the Dolls. **Exhibit 39**, *Plaintiff's*

*Requests for Coaching-Related Compensation*; **Exhibit 40**, *Summary of Plaintiff's Compensation History*; *Ellison Depo.* (Ex. 30) P. 22:8–10.

Response. Deny. The cheer and dance team was not a student club and did not function as a student club. (Exhibit 34. *Coach Weaver's Affidavit.* Exhibit 59. *Greenwood's Deposition P. 16:20-22, P. 17:2-5),* Exhibit 75. *Ellison Deposition P. 18:11-13. Ellison Deposition).*

131.     Plaintiff acknowledged that requests for additional stipend compensation required approval from the College. *Ex. 37*, at Bates 69.

Response. Deny. Smothers stated that he is the one who hires and signs contracts. Exhibit 21 *Smothers Deposition* (P. 15:14-19.

132.     On June 30, 2017, the College approved Plaintiff's request for a stipend in the amount of $5,000.00. *Ex. 39*, at Bates 50; *Ex. 40*, at Bates 54.

Response. Deny. Misrepresentation of facts. Smothers approved a pay request from Athletic Director Cochran on behalf of Ms. Swinton two months after the school year had ended. This was another one of Cochran's attempts at getting Ms. Swinton compensated throughout the year without knowing why Smothers would not sign off for her to receive compensation. Ex. 9-20  *Emails of Various Complaints*

133.     Plaintiff is unaware of anyone who performed the same work but received more compensation. *Swinton Depo.* (Ex. 1) P. 380:11–15.

Response. Deny. Misrepresentation of facts. Exhibit 3 (P. 406:22-25. P. 4071-3, 9-11). *Swinton Deposition.*

134.      Plaintiff alleged that she was discriminated against on the basis of her gender because that is how she "felt . . . based off of the way [she] was being treated." *Id.* at P. 379:20–380:2.

19

Response. Deny. Misrepresentation of facts. (Ex. 4. *Swinton's Affidavit*)

135.    Plaintiff believes that she experienced gender-based discrimination because the other coaches received their compensation on a timely basis. *Id.* at P. 398:3–16, 403:16–18.

Response. Deny. Misrepresentation of facts. (Exhibit 4. *Swinton's Affidavit*).

136.    The College's Volleyball Coach, Mariah Yarbrough, is a female who has coached for three  seasons. *2019 Volleyball Coaches*,       PHILANDER.EDU

https://www.philanderathletics.com/coach/25/5 (last accessed June 14, 2020).

Response. Deny. Ms. Swinton cannot attest to that information.

137.    Plaintiff is unaware of anyone who is similarly situated outside of her protected class but who received more favorable treatment. *Id.* at P. 380:9–10, 426:15–18.

Response. Deny. (Ex. 4. Swinton's Affidavit, Ex. 41. Duvall *Affidavit*)

138.    Plaintiff believes she was "damaged because [she] was asked to coach from the Athletic Director, okay, and he promised [her] pay . . . in 2012." *Id.* at P. 395:1–6.

Response. Deny.

**E      Plaintiff's Allegations of Breach of Contract Regarding the S.T.A.R.T. Program**

139.    On August 6, 2015, because she was frustrated that her compensation as a S.T.A.R.T. instructor was not included in the S.T.A.R.T. budget, she emailed Dr. Frank James, then-Vice President for Academic Affairs, to state that she would "NOT submit [her students'] grades for the program until [she] ha[d] received information about when [she] will be compensated, and until [she] verified with HR that all of the necessary paperwork have been received for [her] compensation to be processed." **Exhibit 47**, *Correspondence Regarding Compensation-Related Concerns*, at Bates 39.

Response. Deny. Dr. Frank James was not Vice President of Academic Affairs in

2015. (Ex. 58. *Frank James's Deposition*).

140.    Mr. Wallace responded that he sent the recommendation for Plaintiff's S.T.A.R.T. compensation back to Dr. Ervin, Plaintiff's Division Chairperson, with a note stating that her position was not included in the budget and a proposed process through which to "quickly resolve[]" her concerns, which included a formal request to change the budget, approval by the responsible administrator to modify the budget if funds were available, and—upon all necessary administrators approving the "recommendation for hire"—requesting that Mr. Chris Newton, then-Director of Human Resources, issue a manual paycheck to Plaintiff. *Id.* at Bates 38.

Response. Deny. Ms. Swinton cannot attest to what Terry Wallace told Chris Newton. A manual check was never issued. (Exhibit 4. *Swinton's Affidavit.*)

141.    Mr. Wallace also noted that the College "often (campus wide) do[es] not fill out the hire form until after the class has begun or in some cases after the class has completed . . .[,]" and that "[w]e have to do a better job in controlling this process." *Id.*

Response. Deny. Ms. Swinton cannot attest to when the request for hire forms are filled out. (Exhibit 4. *Swinton's Affidavit.*)

142.    Plaintiff alleged in her Complaint that the College breached an agreement to pay her $5000.00 in connection with the S.T.A.R.T. program (*Dkt. 1* ¶ 45–46), but the College made that payment on July 14 and 31, 2017. *Ex. 40*, at Bates 54; **Exhibit 43**, *Plaintiff's Requests for Additional Faculty-Related Compensation*, at P. 24; *see also* **Exhibit 46**, *Information Regarding Philander's S.T.A.R.T. Summer Bridge*.

Response. Deny. Misrepresentation of facts. Defendant's Exhibit 43 P. 4 is not a true representation of Ms. Swinton having received pay. Defendant's Exhibit 46 says nothing about Ms. Swinton having received pay for working with START. Defendant's Ex. 40 at Bates 54 only shows a list of numbers. (Exhibit 4**.** *Swinton's Affidavit*)

143.    Plaintiff had no contract to receive additional compensation beyond her base salary and instead predicates her breach of contract claim on Staff Recommendation for Hire (SRH) or Personnel Action Request (PAR) forms, which are documents internal to the College that typically initiate with the requesting employee or her supervisor for circulation among various administrators until the President provides final approval. *Newton Depo.* (Ex. 41) P. 28:12–29:5 (discussing the process of requesting additional compensation); *Smothers Depo.* (Ex. 20) P. 55:23– 56:3, 91:1–9.

Response. Deny. Staff Recommendation for Hire (SRH) or Personnel Action Request (PAR) forms also known as Requisitions (per Smothers) all require final approval from Smothers and are considered contracts for prepayment of work. (Exhibit 21 *Smothers Deposition* P. 91:4-5, P. 92:5-15).

**G      Plaintiff's Alleged Damages**

*144.*    Plaintiff partially mitigated her damages by finding new employment within two months of her termination with the Pulaski County Special School District, where she presently earns $40,806.00 per year as a high school teacher. **Exhibit 48**, *PCSSD Documents.*

Response. Deny. Ms. Swinton was hired as a temporary teacher in fall of 2018 with the Pulaski County Special School District making only $36,663.42, which is less than the amount she was making at Philander. (Exhibit 64. *2018-2019 PCSSD Contract.)*

145.    Plaintiff is unaware of the damages she seeks against the College or in what amount she seeks them. *Swinton Depo.* (Ex. 1) P. 217:16–24, 396:11–20.

Response. Deny. Misrepresentation of facts. (Ex. 3. *Swinton Deposition* P. 217:18-19).

146.    Plaintiff does not know if she seeks any compensatory damages for emotional distress or for any medical injury, *id.* at P. 393:17–394:21, and she could not recall whether she spoke with a mental health care professional in the last two years. *Id.* at P. 394:1–3.

Response. Deny. Ms. Swinton's mental health counseling has a target end date of April 16, 2021. (Ex.65. *Mental Health Report)*

147.    Plaintiff could not provide even a "ballpark figure" of the amount of damages she seeks. *Id.* at P. 425:20–426:5.

Response. Deny. Misrepresentation of facts. Exhibit 3. *Swinton Deposition* (P. 217:18-19).

148.    Plaintiff is unaware of how much she believes she is owed from the College. *Id.* at P. 291:18–24.

Response. Deny. Misrepresentation of facts.  (Exhibit 3. *Swinton Deposition.* (P. 217:18-19). Plaintiff testified that there is no contract that would demonstrate how much money she believes she is owed under her breach of contract claim. *Id.* at P. 217:18–19.

Response. Deny. Misrepresentation of facts. (Ex. 3. *Swinton Deposition* P. 217:18-19*)*

149.    Plaintiff could not testify regarding a dollar amount attributable to her breach of contract claim. *Id.* at P. 396:1–10.

Response. Deny. Misrepresentation of facts. (Ex. 3. *Swinton Deposition.*  P. 217:18-19).

150.    Plaintiff received all compensation from the College to which she was entitled. *See Ex. 39, 40, & 43.*

Response. Deny. Misrepresentation of facts. (Exhibit 3. *Swinton Deposition.*  P. 217:18-19*)*

151.    Plaintiff did not engage in any protected activity during her employment or otherwise during the College's thorough investigation. *Doman Decl.* (Ex. 17) ¶¶ 35, 42–44.

Response. Deny. Neither the investigation of Ms. Swinton nor the investigation of

the incident in Ms. Swinton's classroom were thorough. (Ex. 48. *Affidavit of Student Classroom Witnesses.)*

152.    Plaintiff was terminated for legitimate, non-discriminatory and non-retaliatory reasons—using a disability-related slur during her classroom instruction and then dissembling during the College's investigation—that have no connection with her gender or any other alleged protected status or activity. *Ex. 27.*

Response: Deny.

Respectfully submitted,

Teresa Bloodman #200505
Attorney for Plaintiff
P.O. Box 13641
Maumelle, AR 72113
(870) 550-1940 Direct
teresabloodman@yahoo.com